Matthias, J.
 

 The claimed errors specifically assigned are: Overruling the motion for a directed verdict in favor of the defendant at the close of the plaintiff’s evidence and at the close of all the evidence; overruling defendant’s motion for judgment on the pleadings and the evidence, notwithstanding the verdict; and overruling the defendant’s motion for a new trial.
 

 In addition thereto is assignment designated No. 4 which is as follows:
 

 “The Court of Appeals erred in affirming and not reversing the Court of Common Pleas for error in its charge to the jury after argument in the following respects :
 

 “(a) In submitting to the jury and reading from the second amended petition the first four specifications of alleged misconduct, although defendant specifically moved and requested the court both before argument and after argument to withdraw said specifications from the jury.
 

 
 *180
 
 “(b) In charging the jury that misconduct meant that if defendant failed to exercise ordinary care the plaintiff could recover.
 

 “(c) In failing to properly charge the jury on the issue of misconduct.”
 

 The following physical facts are disclosed by the record:
 

 The defendant owns and operates a line of railroad tracks through the city of Toledo, two of which run underneath the bridge on Oak street. These two are main tracks and run generally in an easterly and westerly direction.. Just north of the bridge and on the same grade as the bridge, defendant owns and maintains five switching tracks, immediately south of which is a signal tower, which is equipped with signals, red lanterns, red flags, and other warning devices, and also a telephone which is directly connected with a telephone in the defendant’s traffic tower located at the Maumee river bridge about 2,000 feet to the west and also connected with telephones maintained by the defendant at other points. The duty of the employee in the signal tower at Oak street was primarily to raise and lower the gates for the protection of pedestrian and vehicular traffic crossing these five switching tracks and his duties were in no way related to the operation of trains on the tracks which passed under the overhead bridge, but to warn children and other trespassers from using the path from Wilmot street down to and on the tracks of the defendant.
 

 Passing under the overhead bridge on Oak street are not only the two tracks owned and maintained by the defendant but also one track owned and maintained by the Baltimore & Ohio Railroad Company. The defendant’s tracks were nearest the tower but the tower was above these tracks and about 70 feet from the nearest New York Central track.
 

 There was testimony tending to show that there was
 
 *181
 
 a path leading from Wilmot street, which is at the end of the Oak street bridge opposite the tower, and that this path extended down to the tracks of the defendant beneath the Oak street bridge and was used by railroad men and sometimes by children.
 

 As developed by the plaintiff’s case, the record shows that at about 4:45 p. m., on July 5,1944, a child, which afterwards proved to be the plaintiff’s decedent, was discovered to be lying between the rails of the defendant’s eastbound main track. A witness, Mrs. Cherry, directed the attention of the defendant’s employee, the watchman in charge of the signal tower at the Oak street bridge, to the situation, who immediately came from his tower and hurried down the embankment to within 20 feet of where the boy was lying, being accompanied part way by the witness, Mrs. Cherry. She testified that the boy was lying on his left side, his back toward her; that she saw no signs of blood, cuts or other injuries, but that he was lying perfectly still.
 

 The witness, Mrs. Cherry, asked the watchman if they could not take the boy off the track, to which inquiry he replied in the negative, saying that “it was railroad property and not to go down there.” Either the witness or the watchman suggested calling the city’s rescue squad. Both immediately returned up the embankment, the defendant’s employee to his place of duty in the tower and the witness, Mrs. Cherry, to a pay station in a nearby business place from which she called the city’s rescue squad. This witness testified there was a path down the embankment on the tower side and also a path on the Wilmot street side of the bridge, extending down to a level of the tracks, which path she had seen children use but she did not think there was any path extending across the tracks.
 

 The second witness called by the plaintiff testified that he was in the business place from which Mrs.
 
 *182
 
 Cherry telephoned for the rescue squad; that he immediately ran to and down under the Oak street bridge; that a passenger train, headed east, was standing there; and that the plaintiff’s decedent was under one of the cars lying on his back. The witness later observed a large gash on the back of decedent’s head. It was stipulated that the death of plaintiff’s decedent resulted from a fractured skull. Evidence was also offered showing that the face, hands, body and legs were covered with grease, sand, cinders, etc., and that the knees were skinned, cut and lacerated, but that there were no broken bones.
 

 Evidence was adduced by the defendant in substance as follows:
 

 About 4:30 on the afternoon of July 5th, the Auer boy and another boy named Kay Klotz left their homes on Utah street, which is two blocks west of Oak street, and walked east along Wilmot street and down into the cut or gorge in which defendant’s tracks are located. They reached that point by a path that leads from Wilmot street, which is at the end of the bridge opposite the signal tower, and went down under the bridge. The Klotz boy testified he had never been down there or played around the bridge before. They crossed all the tracks to the north end of the bridge until they reached the abutments there and the Klotz boy climbed about on the girders of the bridge and found some sparrow’s eggs, a nest and one or two little birds. The boys then came down the embankment from the north end and according to the Klotz boy started to cross the defendant’s tracks, moving generally south. He testified that he saw an eastbound passenger train coming from the Maumee river. The Auer boy was ahead of the Klotz boy and near the center or eastbound track as the train approached, and according to his testimony the plaintiff’s decedent, when last seen by the Klotz boy, was walking toward
 
 *183
 
 the eastbound track. At that moment, and when plaintiff’s decedent was close to the eastbound track, the Klotz boy thought he had dropped his bird and looked back and heard a scream. After the passenger train passed, the Klotz boy saw the plaintiff’s decedent lying on his back between the rails of the eastbound track, approximately under the center of the Oak street bridge; be did not see him get hit by the train.
 

 The Klotz boy ran home, which was two or three blocks away. His parents returned with him to the Oak street bridge where other spectators had gathered.
 

 The watchman, Wakefield, testified that, after seeing the boy’s position, he ran back up the embankment and up the stairs into the Oak street tower and telephoned the defendant’s towerman at the Maumee bridge, which is about 2,000 feet westward, informed him that there was a body on the eastbound track and that all eastbound trains should be stopped. Wake-field was informed that it was too late and that a special troop train was then passing. Wakefield ran out on the platform, waving his arms in the manner necessary to give the stop signal. The testimony of the fireman and engineer was that, immediately upon the signal, the service brakes, but not the emergency brakes, were applied; that the train was not brought to a stop until the engine, tender and a part of the first or second passenger car had passed over the boy; that, at the time of the signal to stop, the passenger train was-going about 12 to 20 miles per hour; and that, at such speed, the application of emergency brakes could not be made with safety to passengers. It is disclosed also that at the time the watchman was giving the stop signal a freight train of the defendant was passing on the westbound track; that as it passed under the bridge the head brakeman, riding with the fireman, observed the Auer boy on the eastbound track and he gave a stop signal to the approaching passenger train.
 
 *184
 
 The engineer testified that he did not make an emergency application of the brakes because of the possible injury to nine carloads of passengers and because of the absence of any observable obstruction ahead.
 

 The evidence as to the relative position, location and condition of the body of the Auer boy before and after the passing of the passenger train is in conflict.
 

 Did the trial court err in refusing to direct a verdict in favor of the defendant at the close of the plaintiff’s evidence and at the close of all the evidence, in overruling the defendant’s motion for judgment on the pleadings and evidence notwithstanding the verdict, and in overruling its motion for a new trial?
 

 From the record it is clear that at the end of the plaintiff’s case there was evidence that the decedent had been run over by a train while lying unconscious between the rails and after notice to the company’s watchman that the decedent was in a place of peril.
 

 It was conceded that decedent died of a fractured skull. There was evidence of a large laceration on the back of his head after he was run over, which laceration witnesses did not see while he was lying between the tracks before being run over.
 

 The motion to direct a verdict at that time was properly overruled.
 

 At the end of all the evidence, the motion for a directed verdict was renewed. The defendant had offered testimony that a train had passed on this track previous to the one which ran over the decedent; that after the passage of the first train decedent was seen lying unconscious between the tracks; that its watchman employee had made an effort to stop the train and prevent further injury to the decedent; and that its engineman had stopped the train by a full service application of the air brakes after signal. The evidence adduced created a factual issue which the court
 
 *185
 
 was warranted in submitting to the jury under proper instructions.
 

 The trial court charged the jury that “there is no evidence in this case of an invitation to plaintiff’s decedent, William Auer, to enter upon and over the defendant’s tracks” and the record in this case supports such instruction. This case is therefore an action to recover damages for causing the death of a trespasser on the tracks of the defendant.
 

 In the case of
 
 Soles, Admr.,
 
 v.
 
 Ohio Edison Co.,
 
 144 Ohio St., 373, 59 N. E. (2d), 138, this court held: “An occupier of land, either as lessee, tenant or by sufferance, owes no duty to a trespasser or licensee upon such land except to refrain from wanton, wilful or reckless misconduct which is likely to injure him.”
 

 However, it is as well settled that once a trespasser has been injured and is discovered in a place of peril, the owner of the premises is required to use ordinary care to avoid injury to him arising from the active negligence of such owner or that of his servants. See 29 Ohio Jurisprudence, 442, Section 46, citing
 
 Union News Co.
 
 v.
 
 Freeborn,
 
 111 Ohio St., 105, 144 N. E., 595. See, also,
 
 Sharp Realty Co.
 
 v.
 
 Forsha, Jr., a Minor,
 
 122 Ohio St., 368, 171 N. E., 598.
 

 The defendant contends that the petition of the plaintiff states a cause of action only for wanton and wilful misconduct; the plaintiff contends that the action against the defendant is one for negligence in failing to avoid injuring the decedent after his position of peril was discovered. The conflict of views in this case arises from the use of the word, “misconduct,” in the petition, followed by allegations sounding in negligence. That these allegations were misleading is disclosed by the fact that the triál court, at the request of the defendant, charged the jury before argument as follows:
 

 
 *186
 
 ‘
 
 ‘
 
 This court charges you as a matter of law that unless you find by a preponderance of the evidence that the conduct of defendant’s employees manifested a complete failure to exercise any care for the safety of the body of William Auer amounting to a complete heedlessness and callous disregard of the consequences of their conduct, even if you also find that defendant’s watchman, Wakefield, or any other employee, was guilty of negligence, which is failing to do what the ordinary prudent person would have done under the same or simlar circumstances, then your verdict must be for the defendant.
 

 “A further charge in writing:
 

 “The court charges you, and you are instructed as a matter of law, that if you find from the evidence in this case that the defendant, through its servants and employees, exercised some, or any, care to avert any injury or damage to the body of William Auer after discovering it between the rails of defendant’s eastbound track, then your verdict must be for the defendant.”
 

 In the general charge the court instructed the jury as follows:
 

 “So that in order for the plaintiff to recover it is necessary that you find that the death of William R. Auer was caused by the misconduct of the defendant and therefore I say to you that to determine that question you must find that the following elements existed:
 

 “First. That the defendant had a knowledge of a situation requiring the exercise of ordinary care and diligence to avert injury or death to another.
 

 “Second. That it had ability to avoid resulting harm by ordinary care and diligence in the use of the means at hand; and
 

 “Third. That it omitted to use such care and diligence to avert the threatened danger when to the ordinary mind it must be apparent that the result is likely
 
 *187
 
 to prove disastrous to another. It must appear that the defendant knew of a situation requiring ordinary care that it had ability to avoid resulting harm through the means at hand but omitted to do so when it is apparent the result is likely to prove disastrous to another, or in short, ladies and gentlemen, you must find that the defendant acted in disregard of the consequences as affecting the life of another.
 

 “Misconduct may also be defined as such conduct as manifests a disposition to perversity, and it must be under such surrounding circumstances and existing conditions that the party doing the act or failing to act must be conscious, from his knowledge of such surrounding circumstances and existing conditions, that his conduct will in all common probability result in injury or death.”
 

 The conflict between the general charge and this special charge is apparent on the face of the record. There is also conflict between parts of the general charge. After first charging that for the plaintiff to recover for death caused by the
 
 misconduct
 
 of the defendant, the jury must find knowledge of a situation requiring the exercise of ordinary care, the ability to avoid the resulting injury by the exercise of ordinary care and, finally, that the defendant omitted to use such care to avert the threatened danger when fea the ordinary mind it must be apparent that the result is likely to prove disastrous to another, the trial court again defined
 
 misconduct
 
 in the same language as this court has previously defined
 
 wanton
 
 misconduct.
 
 Universal Concrete Pipe Co.
 
 v.
 
 Bassett,
 
 130 Ohio St., 567, 200 N. E., 843, 119 A. L. R., 646. In the plaintiff’s second amended petition as submitted to the jury, allegations of negligence were grouped under the heading, “misconduct.’’ The jury was therefore given two conflicting definitions of the word, “misconduct.”
 

 Misconduct is a generic term and is defined in the
 
 *188
 
 Oxford English Dictionary as “bad management,” “mismanagement,” “improper conduct” or “wrong behaviour.” The synonyms, as given in Webster’s New International Dictionary, are “misbehavior,” “misdemeanor, ” “ delinquency ’ ’ and ‘
 
 ‘
 
 offense. ” See, -also, 27 Words and Phrases (Perm. Ed.), 309
 
 et seq.
 

 Since this term is so general in meaning, its use by the plaintiff in his second amended petition, not qualified or defined by the words, “wanton,” or, “wilful,” imports no specific breach of any lawful duty of the defendant. The gravamen of the plaintiff’s complaint against the defendant should be determined solely from the operative facts alleged therein, and not from any words characterizing the acts complained of.
 

 An examination of the facts alleged in the second amended petition clearly discloses a claim by the plaintiff that the death of William R. Auer was caused by the failure of the defendant “to remove said boy from defendant’s tracks, after discovering him, lying thereon helpless and in a position of peril, in time to have removed him in the exercise of ordinary care before the arrival of said passenger train,” or otherwise avert injuring him. The plaintiff by this claim was pleading a case within the application of the doctrine of “discovered peril.” The doctrine of “last clear chance” has no application to a case wherein there is no issue of contributory negligence. 1 Shear-man and Redfield on Negligence (Rev. Ed.), 285.
 

 The doctrine of “discovered peril” is discussed and defined in 3 Shearman' and Redfield on Negligence (Rev. Ed.), 1185
 
 et seq.,
 
 Section 479. The following statement from that discussion is pertinent:
 

 “The rule stated in Section 118 [doctrine of last clear chance], that the plaintiff may recover, notwithstanding his contributory negligence, if the defendant, after becoming chargeable with notice of the plaintiff’s danger, failed to use ordinary care to avoid
 
 *189
 
 injuring him, has been enforced in many railroad cases.
 

 “When it is realized by those in charge of an engine or train that one, though a trespasser, will not- or cannot save himself and will be injured unless they can prevent it, then it is their duty, by the use of all the means at hand, consistent with the safety of the passengers, engine or train, to do all in their power to prevent it.
 

 “The failure to do so, when the injury could thereby have been avoided, is negligence for which the company and such employees will be liable, notwithstanding the antecedent negligence or contributory negligence of one so injured.
 

 “It is universally agreed that this rule applies to all cases in which the defendant or his agent is actually aware of the plaintiff’s danger.”
 

 See, also,
 
 Railway Co.
 
 v. Kassen, 49 Ohio St., 230, 31 N. E., 282, 16 L. R. A., 674, and
 
 Cleveland Ry. Co.
 
 v.
 
 Masterson,
 
 126 Ohio St., 42, 183 N. E., 873, 92 A. L. R., 15.
 

 . The plaintiff, therefore, was entitled to have the jury instructed that he would be entitled to recover if, after discovering the decedent in a position of peril, the defendant failed to exercise ordinary care to avoid injuring him. However, the defendant was likewise entitled to an instruction defining the term, “ordinary care.” The court did not charge the jury as to this very essential element. However, attention was not directed to such omission and no such instruction was requested by the defendant.
 

 This case was presented by the plaintiff on the assumption that the decedent was alive when the train in question struck him. However, there was competent evidence adduced by the defendant that that train was the second train which struck the decedent.
 

 Counsel for plaintiff contend that the defendant’s
 
 *190
 
 evidence in that respect is incredible and should be disregarded, and cite other evidence which they urge shows how the decedent happened to be in the position in which he was found by the defendant’s watchman. It is their theory that the boy was running across the tracks, stumbled and fell, thus badly skinning both knees and striking his forehead with sufficient force to render him unconscious, and that, while lying in that state, he was struck by the second train.
 

 To sustain his theory that the decedent was alive at the time the train in question ran over the decedent the plaintiff relies on the rule commonly called “The presumption of the continuance of life.” This rule is stated in 13 Ohio Jurisprudence, 366, Section 10, as follows:
 

 “The law presumes that a person, proved to be alive at a given time, remains alive, until the contrary is shown by some sufficient proof, or, in the absence of such proof, until a different presumption arises.”
 

 The same rule is stated in 1 Jones Commentaries on Evidence (2 Ed.), 464, Section 283, as follows: “When a person is shown to have been alive at a given time, he is presumed to have continued alive until the contrary is proved or is to be inferred from the nature and circumstances of the case.” See
 
 Fini, Admr.,
 
 v.
 
 Perry,
 
 119 Ohio St., 367, 164 N. E., 358.
 

 The burden of proving that the decedent was alive when defendant’s train ran over him was on the plaintiff, and the court so instructed the jury. The court charged that “in order for the plaintiff to recover it is necessary that you find that the death of William R. Auer was caused directly and proximately by the misconduct of the defendant in the particulars set forth in the second amended petition.”
 

 There was much confusion in the trial and the sub
 
 *191
 
 mission of the case as to the issues involved, resulting in inconsistent and contradictory instructions to the jury. The case is essentially one of claimed “dis: covered peril” rather than one necessarily involving wanton or wilful misconduct. The instructions given by the court before argument and in the general charge, relative to wanton or wilful misconduct placed an improper and unjust burden upon the plaintiff and were therefore prejudicial to him. On the whole we do not find error prejudicial to the defendant.
 

 It follows that the judgment of the Court of Appeals should be, and is hereby, affirmed.
 

 Judgment affirmed.
 

 Weygandt, C. J., Hart, Zimmerman, Sohngen and Stewart, JJ., concur.
 

 Turner, J., dissents.