[This opinion has been published in *Ohio Official Reports* at 75 Ohio St.3d 312.]

GLADON, APPELLEE AND CROSS-APPELLANT, *v.* GREATER CLEVELAND REGIONAL TRANSIT AUTHORITY, APPELLANT AND CROSS-APPELLEE.

[Cite as Gladon v. Greater Cleveland Regional Transit Auth., 1996-Ohio-137.]

*Torts—Negligence—Passenger injured at rapid transit station—Duty of care owed passenger—Where entrant upon another's land exceeds scope of landowner's invitation, entrant loses status of an invitee and becomes either a licensee or trespasser.*

(No. 94-1063—Submitted September 13, 1995 and December 13, 1995—Decided March 6, 1996.)

APPEAL and CROSS-APPEAL from the Court of Appeals for Cuyahoga County, No. 64029.

————————————

{¶ 1} Greater Cleveland Regional Transit Authority ("RTA") appeals from a jury verdict awarding Robert M. Gladon $2,736,915.35 in damages arising from RTA's operation of a rapid transit train.

{¶ 2} Gladon purchased a passenger ticket and boarded an RTA rapid transit train at Terminal Tower after attending a Cleveland Indians' night game with friends. During the baseball game, Gladon consumed about five 16-ounce beers. He left his friends at the stadium in search of a restroom, and ended up traveling alone on the RTA trains. Because there were no witnesses, the jury only heard Gladon's account of events. According to Gladon, he mistakenly exited the train at the West 65th Street Station and, once on the platform, was chased and attacked by two unknown males. Gladon testified that he remembered being "rolled up in a ball" on the tracks but he could not recall if he had jumped onto the tracks or had

been pushed onto the tracks. While there, however, he did recall being kicked in the head.

{¶ 3} While Gladon lay on the tracks with his legs draped over the rail, an RTA rapid train approached the West 65th Street Station. Mary Bell, the train's operator, had the train in braking mode when she observed first a tennis shoe and then Gladon's leg on the tracks. The operator pulled the cinestar, or control handle, back and hit the "mushroom," or emergency brake. Unfortunately, the train struck Gladon causing him serious and permanent injuries.

{¶ 4} Gladon sued RTA and the operator alleging negligence in the security of RTA's premises and in the operation of the train. Specifically, Gladon alleged that the operator was negligent by failing to bring the train to a stop "after the point she perceived or should have perceived the Plaintiff's peril prior to her striking the Plaintiff." The trial court granted RTA summary judgment as to the negligent security claim and the case proceeded to trial on the negligent operation claim.

{¶ 5} The trial court overruled RTA's motion for a directed verdict at the close of Gladon's case-in-chief. The court instructed the jury that "as a matter of law that the only evidence produced by either side indicates that the plaintiff was an invitee." The court further informed the jury that "the driver of a rapid transit car with the right of way must use ordinary care. Therefore, to avoid colliding with a person found on the tracks, the defendant is required to use ordinary care to discover and to avoid danger." The jury returned a verdict for Gladon and overruled RTA's motion for judgment notwithstanding the verdict. The court of appeals affirmed.

{¶ 6} This cause is now before this court upon the allowance of a discretionary appeal and cross-appeal.

————————————

*Donald E. Caravona & Associates, Donald E. Caravona* and *Michael W. Czack*, for appellee and cross-appellant.

*Ulmer & Berne, F. Thomas Vickers* and *James A. Vollins*, for appellant and cross-appellee.

*Wanda Rembert Arnold* and *Inajo T. Davis*, urging reversal for *amicus curiae,* Cleveland Board of Education.

*John E. Gotherman* and *Malcolm C. Douglas*, urging reversal for *amici curiae*, Ohio Municipal League, Ohio Municipal Attorneys Association and Ohio Municipal Joint Self-Insurance Pool.

*R. Todd Hunt*, urging reversal for *amicus curiae*, Ohio Township Association and Cuyahoga County Law Directors Association.

*Malcolm C. Douglas; Ronald J. O'Brien,* Columbus City Attorney, *Sharon Sobol Jordan*, Cleveland Director of Law, *Faye D. Dupuis*, Cincinnati City Solicitor, *John H. Mattimoe*, Toledo Director of Law, and *Mark S. Schmollinger*, Toledo General Counsel, *J. Anthony Sawyer,* Dayton Director of Law, and *Michael E. Murman,* Lakewood Director of Law, urging reversal for *amici curiae*, cities of Columbus, Cleveland, Cincinnati, Toledo, Dayton, and Lakewood, Ohio.

*Maribeth Deavers* and *D. Allen Asbury*, urging reversal for *amicus curiae,* Central Ohio Transit Authority.

*Rosplock, Curlson, Perez, Deeb & Ezzone* and *Donald J. Ezzone*, urging reversal for *amicus curiae,* Laketran Regional Transit Authority.

*Kitchen Deery & Barnhouse, Vincent A. Feudo, Eugene B. Meador* and *William F. Schmitz*, urging reversal for *amicus curiae*, Ohio Risk Management Association.

*Means, Bichimer, Burkholder & Baker Co., L.P.A.,* and *Kimball H. Carey*, urging reversal for *amicus curiae,* Ohio School Boards Association.

*Peck, Shaffer & Williams* and *Thomas A. Luebbers*, urging reversal for *amicus curiae*, County Commissioners Association of Ohio.

*Mark W. Ruf*, urging affirmance for *amicus curiae*, Ohio Academy of Trial Lawyers.

**COOK, J.**

{¶ 7} Because we find another issue dispositive of this appeal, we fail to reach the substantial constitutional question regarding R.C. 2744.05(C) that we otherwise would have reached.[1] We determine that the trial court erred in instructing the jury about plaintiff's legal status and RTA's corresponding duty. The trial court instructed the jury "as a matter of law that *** the plaintiff was an invitee," and that as a result RTA was "required to use ordinary care to discover and to avoid danger." The trial court did not give the instruction that prior to discovering Gladon, RTA was obliged to refrain from willful and wanton conduct which was likely to injure Gladon. Given the evidence presented in the trial of this case, the erroneous instruction was prejudicial. Accordingly, we reverse the judgment of the trial court and remand the cause for a new trial.

I.

DUTY CLASSIFICATIONS

{¶ 8} Ohio adheres to the common-law classifications of invitee, licensee, and trespasser in cases of premises liability. *Shump v. First Continental-Robinwood Assoc.* (1994), 71 Ohio St.3d 414, 417, 644 N.E.2d 291, 294; *Boydston v. Norfolk S. Corp.* (1991), 73 Ohio App.3d 727, 733, 598 N.E.2d 171, 175. Although there was a movement in many jurisdictions in the 1970s to abolish these traditional duty classification schemes, it quite abruptly lost its steam late in that decade. Prosser & Keaton, Law of Torts (5 Ed.1984) 433, Section 62. Prosser hypothesizes that the

---

1. Although the parties and *amici* extensively briefed the issues surrounding the constitutionality of R.C. 2744.05(C) at the request of this court, our decision to remand this cause for a new trial precludes a determination of that issue. At the new trial, the jury may not find that the RTA breached its duty to Gladon or the jury may award Gladon less than $250,000 for pain and suffering. Consequently, any opinion we would render on the issue of the constitutionality of a cap on an award for pain and suffering before a jury verdict has been rendered would be advisory in nature. It is well settled that this court will not indulge in advisory opinions. *Egan v. Natl. Distillers & Chem. Corp.* (1986), 25 Ohio St.3d 176, 25 OBR 243, 495 N.E.2d 904, syllabus.

retreat may reflect a "fundamental dissatisfaction with certain developments in accident law that accelerated during the 1960s---the reduction of whole systems of legal principles to a single, perhaps simplistic, standard of reasonable care, the sometimes blind subordination of other legitimate social objectives to the goals of accident prevention and compensation, and the commensurate shifting of the decisional balance of power to the jury from the judge. At least it appears that the courts are gaining a renewed appreciation for the considerations behind the traditional duty limitations toward trespassing adults, and that they are acquiring more generally a healthy skepticism toward invitations to jettison years of developed jurisprudence in favor of a beguiling legal panacea." Id. at 433-434.

{¶ 9} In Ohio, the status of the person who enters upon the land of another (*i.e.*, trespasser, licensee, or invitee) continues to define the scope of the legal duty that the landowner owes the entrant. *Shump,* 71 Ohio St. at 417, 644 N.E.2d at 294. Invitees are persons who rightfully come upon the premises of another by invitation, express or implied, for some purpose which is beneficial to the owner. *Light v. Ohio Univ.* (1986), 28 Ohio St.3d 66, 68, 28 OBR 165, 167, 502 N.E.2d 611, 613; *Scheibel v. Lipton* (1951), 156 Ohio St. 308, 46 O.O. 177, 102 N.E.2d 453, paragraph one of the syllabus.

{¶ 10} The status of an invitee is not absolute but is limited by the landowner's invitation. "*** The visitor has the status of an invitee only while he is on part of the land to which his invitation extends—or in other words, the part of the land upon which the possessor gives him reason to believe that his presence is desired for the purpose for which he has come * * * If the invitee goes outside of the area of his invitation, he becomes a trespasser or a licensee, depending upon whether he goes there without the consent of the possessor, or with such consent." 2 Restatement of the Law 2d, Torts (1965) 181-182, Section 332, Comment *l*.

{¶ 11} In the present case, Gladon was an invitee when he purchased an RTA ticket, rode the rapid transit train and waited at RTA's platform. However,

RTA's invitation to Gladon to use their premises did not extend to the area on or near the tracks.  In fact, Gladon acknowledged that RTA did not permit the public in the area on or near the tracks.

{¶ 12} Although the result seems harsh, the common law on this subject is well grounded and we are not inclined to reject it.  Accordingly, we hold that where an entrant upon another's land exceeds the scope of the landowner's invitation, the entrant will lose the status of an invitee, and become either a licensee or trespasser. See *Clary v. McDonald* (1963), 120 Ohio App. 8, 11, 28 O.O.2d 169, 171, 200 N.E.2d 805, 808; *Sweet v. Clare-Mar Camp, Inc.* (1987), 38 Ohio App.3d 6, 9, 526 N.E.2d 74, 78.  See, also, Restatement of Torts 2d, *supra* Section 332, Comment *l*.

{¶ 13} Gladon contends that he retained his invitee status because there was no evidence that he "intentionally or purposely entered upon the track area."

{¶ 14} According to the Restatement, "so far as the liability of the possessor of the land to the intruder is concerned, however, the possessor's duty, and liability, will be the same regardless of the manner of entry, so long as the entry itself is not privileged." Restatement of Torts 2d, 171-172, *supra*, Section 329, Comment c.

{¶ 15} In determining whether the person is a trespasser within the meaning of this section, the question whether his entry has been intentional, negligent or purely accidental is not material, except as it may bear on the existence of a privilege. *Id.* at 171. Without the consent or privilege to enter the area of the tracks, the law views such entry from the aspect of the landowner whose duties to the entrant flow from the parameters of his permission to be there.  As a result, "the determining fact is the presence or absence of a privilege to enter or to remain on the land, and the status of an accidental trespasser is still that of a trespasser." *Id.* at 172.

{¶ 16} The illustration employed by the Restatement to explain the duties owed to a trespasser is remarkably similar to Gladon's situation. "Without any negligence on his part A, standing on the platform of a subway station of the X

6

Company, slips and falls onto the tracks. While there he is run over by the train of X Company, and injured. A is a trespasser, and the liability to him is determined by the rules stated in sections 333 and 336, notwithstanding the accidental character of his intrusion." *Id.* at 171, Illustration 1.[2]

{¶ 17} Furthermore, whether Gladon was privileged to enter the tracks is immaterial. A person privileged to enter the land is owed the same duties as a licensee. Restatement of Torts, *supra*, at Section 345. Because the duties owed to a licensee and trespasser are the same, whether Gladon was privileged to enter the land does not change the standard of care RTA owed to him. *Sole v. Ohio Edison Co.* (1945), 144 Ohio St. 373, 29 O.O. 559, 59 N.E.2d 138, paragraph one of the syllabus.

{¶ 18} Even though his entry may have been unintentional and against Gladon's wishes, once on the tracks, Gladon exceeded the scope of his invitation and lost his status as an invitee. Because Gladon then became either a licensee or a trespasser for purposes of determining the duty RTA owed to him, the trial court erred in instructing the jury that he was an invitee as a matter of law.

{¶ 19} We now turn to the duty owed to Gladon by RTA as a result of Gladon's change in status from invitee to either licensee or trespasser. A landowner owes a duty to an invitee to exercise ordinary care for the invitee's safety and

---

2. Section 333 states generally that "a possessor of land is not liable to trespassers for physical harm caused by his failure to exercise reasonable care (a) to put the land in a condition reasonably safe for their reception, or (b) to carry on his activities so as not to endanger them." Restatement of Law 2d, Torts (1965) 183, Section 333. Section 336 generally prescribes the duty of ordinary care from a possessor of land who knows or has reason to know of the presence of another who is trespassing on the land. Restatement of the Law 2d, *supra*, at Section 336. Again, the example cited by the Restatement for this duty is identical to the situation when the train driver saw Gladon and his shoe on the tracks. "The engineer of the X &Y Railroad Company sees lying upon the track a pile of clothing such as would give a reasonable man cause to suspect that it might contain a human being. Under these circumstances the engineer is not entitled to assume that it is not a human being but is required to keep the engine under control until he is certain that it is not." *Id.* at 191-192, Comment *b*, Illustration 1.

protection. *Light*, 28 Ohio St.3d at 68, 28 OBR at 167, 502 N.E.2d at 613. Conversely, a landowner owes no duty to a licensee or trespasser except to refrain from willful, wanton or reckless conduct which is likely to injure him. *Sole v. Ohio Edison Co.* (1945), 144 Ohio St. 373, 29 O.O. 559, 59 N.E.2d 138, paragraph one of the syllabus. See, also, *Provencher v. Ohio Dept. of Transp.* (1990), 49 Ohio St.3d 265, 266, 551 N.E.2d 1257, 1258; *McKinney v. Hartz & Restle Realtors, Inc.* (1987), 31 Ohio St.3d 244, 246, 31 OBR 449, 450-451, 510 N.E.2d 386, 388; *Brooks v. Norfolk & W. Ry. Co.* (1976), 45 Ohio St.2d 34, 74 O.O.2d 53, 340 N.E.2d 392, paragraph one of the syllabus ("Where the status of a plaintiff is that of a trespasser on a railroad right-of-way at the time certain injuries were sustained by him, recovery can only be had against the railroad if the record demonstrates wanton misconduct on its part in connection with the accident."). Furthermore, a railroad owes no duty to anticipate or prevent the presence of licensees or trespassers. *McKinney*, 31 Ohio St.3d at 246-247, 31 OBR at 451, 510 N.E.2d at 389; *Brooks*, 45 Ohio St.2d at 38, 74 O.O.2d at 451, 340 N.E.2d at 394; *Cleveland, A. & C. Ry. Co. v. Workman* (1902), 66 Ohio St. 509, 540, 64 N.E. 582, 587 (A railroad owed a licensee no duty of "active vigilance to especially look out for and protect him."); see *Mima v. Akron* (1986), 31 Ohio App.3d 124, 126, 31 OBR 211, 213, 508 N.E.2d 974, 976.

{¶ 20} When a trespasser or licensee is discovered in a position of peril, a landowner is required to use ordinary care to avoid injuring him. *Cole v. New York Central RR. Co.* (1948), 150 Ohio St. 175, 185, 37 O.O. 459, 463, 80 N.E.2d 854, 860; *Cleveland C., C. & St. L. Ry. Co. v. Potter* (1925), 113 Ohio St. 591, 600-601, 150 N.E. 44, 47. The duty to exercise ordinary care arises after the landowner "knows, or from facts within his knowledge should know or believe," that a trespasser or licensee is on the land. Restatement of Torts, *supra*, at Section 336, Comment *d*.

**{¶ 21}** Having instructed the jury as a matter of law that Gladon was an invitee, the trial court assigned RTA a duty of ordinary care "to discover and to avoid danger." These instructions erred in two respects. First, the instructions imposed upon RTA a duty to use ordinary care to discover Gladon's presence. To the contrary, RTA was under no duty to anticipate trespassers and could only be liable for injuries resulting from willful or wanton conduct. Second, the instructions imposed upon RTA a duty to use ordinary care to avoid injuring Gladon prior to the operator's discovery of him. Rather, RTA's duty to use ordinary care to avoid injuring Gladon did not arise until RTA knew or should have known that Gladon was on the tracks. Whether the operator knew or should have known a person was on the tracks upon observing the tennis shoe remains a question for the jury.

**{¶ 22}** Given that the instructions were erroneous and prejudicial, we reverse the judgment of the court of appeals and remand this cause for a new trial.

II

MOTIONS FOR DIRECTED VERDICT / JNOV

**{¶ 23}** Having determined that the duty of care owed to Gladon changed with his status, we now examine the issue of whether the trial court should have granted RTA a directed verdict or judgment notwithstanding the verdict. RTA contends the evidence produced at trial failed to prove that their operator breached the duty of care owed to Gladon.

**{¶ 24}** "The test to be applied by a trial court in ruling on a motion for judgment notwithstanding the verdict is the same test to be applied on a motion for a directed verdict. The evidence adduced at trial and the facts established by admissions in the pleadings and in the record must be construed most strongly in favor of the party against whom the motion is made, and, where there is substantial evidence to support his side of the case, upon which reasonable minds may reach different conclusions, the motion must be denied. Neither the weight of the evidence nor the credibility of the witnesses is for the court's determination in ruling

9

upon either of the above motions." *Posin v. A. B. C. Motor Court Hotel, Inc.* (1976), 45 Ohio St.2d 271, 275, 74 O.O.2d 427, 430, 344 N.E.2d 334, 338, citing *McNees v. Cincinnati Street Ry. Co.* (1949), 152 Ohio St. 269, 40 O.O. 318, 89 N.E.2d 138; *Ayers v. Woodard* (1957), 166 Ohio St. 138, 1 O.O.2d 377, 140 N.E.2d 401; Civ.R. 50(A) and (B).

A

*Application of the Willful and Wanton Standard*

{¶ 25} RTA owed Gladon no duty except to avoid injuring him by willful or wanton conduct prior to discovering Gladon on the tracks. See *McKinney*, 31 Ohio St.3d at 246, 31 OBR at 450-451, 510 N.E.2d at 388. Willful conduct "'involves an intent, purpose or design to injure.'" *Id.* at 246, 31 OBR at 451, 510 N.E.2d at 388-389, quoting *Denzer v. Terpstra* (1934), 129 Ohio St. 1, 1 O.O. 303, 193 N.E. 647, paragraph two of the syllabus. Wanton conduct involves the failure to exercise "'any care whatsoever toward those to whom he owes a duty of care, and his failure occurs under the circumstances in which there is great probability that harm will result.'" *Id.* at 246, 31 OBR at 451, 510 N.E.2d at 389, quoting *Hawkins v. Ivy* (1977), 50 Ohio St.2d 114, 4 O.O.3d 243, 363 N.E.2d 367, syllabus.

{¶ 26} At trial, Gladon produced evidence that the tracks were wet when the operator traveled eastbound toward the West 65th Street platform. The testimony of the operator indicates that she had the train in braking mode as she traveled through a dark area near the platform with her high beams on at an estimated 20 m.p.h. Generally, the speed limit in that area is 25 m.p.h., but when a train is going to pass rather than stop at a platform, the permitted speed is 5 m.p.h.

{¶ 27} Gladon also presented RTA regulations which require operators to operate the trains on sight, within the range of vision, at all times, and to anticipate changes in the range of vision. According to the RTA operator, operators "constantly run" their trains under "line of sight," or at a speed which will permit stopping within one-half of the range of vision or within one-half of the distance to

an opposing object. Gladon offered evidence that when tracks are wet, an operator must adjust the train's speed in light of the weather conditions on the track.

{¶ 28} In *McKinney v. Hartz & Restle Realtors, Inc.*, we determined that a railroad company was entitled to a directed verdict in the absence of any evidence of speeding or other wanton misconduct. 31 Ohio St.3d at 247, 31 OBR at 451, 510 N.E.2d at 389. Our precedent has impliedly held that speeding may be evidence of wanton misconduct. *Id.*; see, generally, *Brooks*, 45 Ohio St.3d at 37, 340 N.E.2d at 394.

{¶ 29} Viewing these facts in the light most favorable to Gladon, we find that in this trial reasonable minds could have reached different conclusions regarding whether the speed of the train at the time the operator approached the West 65th platform meets the wanton standard in light of the operator's duty to adjust the train's speed to her range of vision and to the known track conditions. Therefore, the trial court did not err in overruling RTA's motions for a directed verdict or judgment notwithstanding the verdict.

B

*Application of the Ordinary Care Standard*

{¶ 30} RTA owed Gladon a duty to use reasonable care to avoid injuring Gladon after the operator discovered Gladon on the tracks. *Cole*, 150 Ohio St. at 185, 37 O.O. at 463, 80 N.E.2d at 860. Here, again, the RTA contends that Gladon failed to produce evidence of a breach of that duty.

{¶ 31} Viewing these facts presented in this trial in the light most favorable to Gladon, reasonable minds could have reached different conclusions as to whether the operator exercised ordinary care. First, the point at which this duty arose remains a question for the jury. Reasonable minds could have reached different conclusions regarding whether the operator should have known a person was on the tracks when she saw the tennis shoes. Second, when the operator did realize a person was on the tracks, she was not sure whether she pulled the cinestar all the

11

way back to the maximum braking mode before she hit the "mushroom" when she observed Gladon's legs on the tracks. Furthermore, the operator testified that she was not sure whether she hit the "mushroom" before or after the train struck Gladon.

{¶ 32} While we find that the trial court properly overruled the motions for directed verdict and for judgment notwithstanding the verdict, we reverse the judgment of the court of appeals and remand this cause for a new trial based on the erroneous jury instructions.

*Judgment reversed*
*and cause remanded.*

MOYER, C.J., and WRIGHT, J., concur.

WRIGHT, J., concurs separately.

NADER, J., concurs in judgment only.

DOUGLAS, RESNICK and PFEIFER, JJ., dissent.

ROBERT A. NADER, J., of THE Eleventh Appellate District, sitting for F.E. SWEENEY, J.

_____

**WRIGHT, J., concurring.**

{¶ 33} I concur in Justice Cook's opinion. I write separately to address the dissent's analysis of the so-called *real* issue in this case. Before today, I never believed I could disagree with an opinion that relies on the Declaration of Independence. The dissent has risen to that challenge.

{¶ 34} The dissent takes issue with the majority's refusal to reach the constitutional question raised by this case. This is surprising, when one recalls the long-standing principle that we will not address constitutional questions unless absolutely necessary. *Norandex, Inc. v. Limbach* (1994), 69 Ohio St.3d 26, 28, 630 N.E.2d 329, 331; *Hal Artz Lincoln Mercury, Inc. v. Ford Motor Co.* (1986), 28 Ohio St.3d 20, 28, 28 OBR 83, 90, 502 N.E.2d 590, 597, fn. 17; *State ex rel.*

*Hofstetter v. Kronk* (1969), 20 Ohio St.2d 117, 119, 49 O.O.2d 440, 441, 254 N.E.2d 15, 17.

{¶ 35} The dissent attempts to circumvent this consideration by assailing the majority's determination that Gladon was not an invitee and by launching an assault on the common-law duty classifications. In doing so, the dissent fails to consider the words of Oliver Wendell Holmes that "[t]he life of the law has not been logic: It has been experience." Holmes, The Common Law (1881) 1. Instead, the dissent proposes to abolish the traditional duty categories, which are the result of generations of accumulated legal thought, simply because their application in this case does not comport with the dissent's understanding of "fairness."

{¶ 36} As far as the *real* issue in this case is concerned, the dissent has based its analysis on a mischaracterization of the common-law rights of litigants to a jury trial. The dissent correctly notes that Section 5, Article I of the Ohio Constitution guarantees a jury trial only in those instances in which the common law, at the time of the Ohio Constitution's adoption, recognized that right. *Zoppo v. Homestead Ins. Co.* (1994), 71 Ohio St.3d 552, 556, 644 N.E.2d 397, 401; *Sorrell v. Thevenir* (1994), 69 Ohio St.3d 415, 421, 633 N.E.2d 504, 510; *Belding v. State ex rel. Heifner* (1929), 121 Ohio St. 393, 169 N.E. 301, paragraph one of the syllabus.

{¶ 37} For whatever reason, however, the dissent seeks to cast the issue in this case in terms of whether the common law afforded individuals "a right to a jury trial in a negligence action against a *political subdivision* of the state at the time the Ohio Constitution was adopted." (Emphasis *sic*.) This narrow characterization ignores the reality that, regardless of the level of government to which the doctrine was applied, sovereign immunity *did* exist at common law. Consequently, where sovereign immunity operates, a plaintiff has no right to a cause of action, let alone a trial by jury. Thus, were we to have reached the Section 5, Article I issue, that issue would have been properly framed as: "Do litigants possess a right to a jury

trial when the defendant is a governmental entity which enjoys sovereign immunity?" This query could only have been answered in the negative.

{¶ 38} Admittedly, R.C. 2744.02(B)(2) and prior case law have refused to apply municipal sovereign immunity when the injury to the plaintiff is the result of the municipality's exercise of "proprietary" functions. Indeed, it is precisely this limitation on sovereign immunity which enabled Gladon to bring his claim against GCRTA.[3] However, our case law has consistently stated that, because of its origins in the common law, the contours of municipal sovereign immunity are open to legislative reversal or modification. *Haverlack v. Portage Homes, Inc.* (1982), 2 Ohio St.3d 26, 30, 2 OBR 572, 575, 442 N.E.2d 749, 752; *Haas v. Hayslip* (1977), 51 Ohio St.2d 135, 136, 5 O.O.3d 110, 111, 364 N.E.2d 1376, 1377; *Hack v. Salem* (1963), 174 Ohio St. 383, 384, 23 O.O.3d 34, 189 N.E.2d 857, 858; *Broughton v. Cleveland* (1957), 167 Ohio St. 29, 31, 4 O.O.2d 1, 2, 146 N.E.2d 301, 303. Indeed, in *Menefee v. Queen City Metro* (1990), 49 Ohio St.3d 27, 29, 550 N.E.2d 181, 182, we noted that the General Assembly could "extend[] sovereign immunity to *all* claims against a political subdivision." (Emphasis *sic*.) In light of this consideration, the cap that R.C. 2744.05(C) places on pain and suffering awards cannot be rationally regarded as an unconstitutional infringement on the province of the jury.

———————————

**NADER, J., concurring in judgment only.**

{¶ 39} I agree that Ohio maintains its traditional duty classifications in cases of premises liability and that one's status is determined at entry in accordance with the landowner's invitation.

———————————

3. R.C. 2744.01(G)(2) states that "[a] 'proprietary function' includes *** (c) [t]he establishment, maintenance, and operation of *** a railroad, a busline or other transit company ***."

**{¶ 40}** Gladon quite clearly entered appellant's property as an invitee. The cases cited affirm that one can change that status by exceeding the terms of the admission. All these cases, however, show intentional divergence; and while the theories propounded by Prosser and the Restatement of Torts 2d support each other, neither authority convinces me nor compels the conclusion that Gladon's apparently involuntary and unexplained presence upon appellant's tracks automatically transmuted his status to that of a trespasser.

**{¶ 41}** The evidence, in this case, is not so determinative of status by location or purpose as to support a finding of invitee or trespasser, as a matter of law, and the trial court erred in not submitting that issue to the jury, as presented. While appreciating the practical concern in limiting a landowner's duty to trespassers, it is similarly difficult for me to accept the forfeiture of that duty, by an invitee, for an involuntary action.

**{¶ 42}** I believe the trial court should have accommodated this peculiar situation by crafting an appropriate instruction permitting the jury to consider the status-duty enigma fairly, upon the facts presented.

**{¶ 43}** A less forceful approach to conform irregular facts to a standard charge may not have been in error, or may have been harmless error, so this matter could have proceeded on its most contentious issue, the constitutionality of R.C. 2744.05(C).

————————————

**DOUGLAS, J., dissenting.**

**{¶ 44}** The *real* issue in this case is whether any application of R.C 2744.05(C) to reduce or "cap" a jury award in a negligence action against a political subdivision of the state violates the right to trial by jury. Resolution of this issue involves the question whether there exists a common-law right to a jury trial in a negligence action against a corporate political subdivision of the state or, conversely, whether corporate political subdivisions were historically protected

from liability under the doctrine of sovereign immunity.  However, the majority has completely avoided this issue by focusing instead on issues of jury instructions and by relying on the archaic common-law entrant classification system to determine the duty owed by a landowner to entrants upon the landowner's premises.  In my judgment, the manner in which the majority has adroitly avoided the real issue in this case is, at the least, unfortunate.

{¶ 45} The plurality opinion says in footnote one that the parties and *amici* have extensively briefed the issues surrounding the constitutionality of R.C. 2744.05(C) "*at the request of this court*."  (Emphasis added.)  This statement implies that the question whether R.C. 2744.05(C) is constitutional has nothing to do with this case, and that the parties and *amici* have addressed the question solely at our urging.  However, that is not accurate.  Both the trial court and the court of appeals found that R.C. 2744.05(C) is an unconstitutional exercise of legislative authority.  The parties and *amici* extensively briefed the issues concerning the constitutionality of R.C. 2744.05(C) because those issues are what brought this case to this court.  Only after the parties and *amici* filed their briefs in this court, and after we heard oral arguments in this case, did we specifically request that the parties submit *supplemental* briefing on the issues concerning the constitutionality of R.C 2744.05(C).  We asked for additional briefing on these issues because we too recognized the importance of deciding the significant constitutional questions in this case.  Further, we knew at that time that the issue concerning the constitutionality of R.C. 2744.05(C) was the *only* issue that had been raised in appellant's appeal that had any possible merit.

{¶ 46} Obviously, this court did *not* accept jurisdiction in this case to perpetuate the artificial common-law classification system for determining the duty owed by a landowner to the entrants upon the landowner's property, and we certainly did *not* accept jurisdiction to *avoid* deciding whether R.C. 2744.05(C) is constitutional.  The parties and *amici* have specifically asked us to determine

whether R.C. 2744.05(C) is constitutional, and that issue is ripe for our determination. Unfortunately, today's plurality has gone to great lengths not to decide the important constitutional questions by holding that the intervening criminal acts of third parties can magically change the legal status of a business invitee. Because that proposition has no basis in law, I must respectfully but vigorously dissent.

{¶ 47} I write this dissenting opinion not so much to persuade as to point out the flaws in the majority's rationale and to spark critical thinking and scholarly debate and writing concerning the constitutionality of R.C. 2744.05(C). The question whether R.C. 2744.05(C) is a constitutional exercise of legislative authority is almost certain to come before this court on another occasion. Indeed, the Court of Appeals for the Eighth Appellate District decided in this case that the R.C. 2744.05(C) cap on damages is unconstitutional. Today's majority opinion reverses the judgment of the court of appeals *on different grounds*. Thus, if any other appellate district court of appeals reaches the opposite conclusion, that R.C. 2744.05(C) is constitutional, that court will almost certainly certify the issue to this court for review and final determination pursuant to Section 3(B)(4), Article IV of the Ohio Constitution.

I

The Facts

{¶ 48} The facts of this case are not in dispute. On April 27, 1988, Robert M. Gladon, appellee and cross-appellant, attended a Cleveland Indians baseball game at Cleveland Stadium. After the game, Gladon proceeded to the Terminal Tower station of the Greater Cleveland Regional Transit Authority ("GCRTA"), appellant and cross-appellee, and paid his fare to ride a rapid transit train to the near west side of Cleveland. At that time, Gladon also obtained a transfer ticket allowing him to ride a bus to his home in Lakewood once he left the train. Gladon rode the

rapid transit train to the West 65th Street station. Upon leaving the train, Gladon was approached and assaulted by two unidentified males.

{¶ 49} Gladon's assailants left him lying on the tracks at the West 65th Street station. Meanwhile, a GCRTA rapid transit train operated by Mary Bell was quickly approaching the West 65th Street station. Bell was on her last run for the evening and was traveling at a high rate of speed. She had been running late on her route and was trying to "make up some time." The tracks were wet and slippery. The weather was a combination of snow, sleet, and rain.

{¶ 50} As Bell approached the West 65th Street station with her high beam lights illuminated, she saw a peculiar object on the tracks. As the train continued forward, Bell realized that the object on the tracks was a tennis shoe. As the train moved even closer, Bell realized that there was a leg attached to the tennis shoe. At that time, Bell attempted to stop the train by pulling the control handle back. She then hit the "mushroom," which was designed to put the train into maximum braking mode. Bell was unsure whether she hit the mushroom before or after running over Gladon. In any event, the train did not stop in time, apparently due to the wet conditions of the tracks. The train struck Gladon, causing him severe and permanent injuries.

{¶ 51} Gladon sued GCRTA for negligence arising out of the operation of the rapid transit train. This claim proceeded to trial before a jury. At the close of the evidence, the trial court instructed the jury, in part, as follows:

"[W]e have heard a great deal of conversation during the evidence in this case about the question of whether or not the plaintiff was a trespasser, or an invitee on the property of RTA at the time he was injured.

"When one is on the property of another, he is normally an invitee, a licensee or a trespasser, depending upon the evidence, and different standards of care apply to each of those three different categories.

18

"Sometimes that's a matter for the jury to determine based upon the evidence. In this case the Court is instructing you as a matter of law that the only evidence produced by either side indicates that the plaintiff was an invitee. The only evidence we have heard with regard to how he got on the ground was his recollection that he bought a transfer at Tower City, got off the train at the platform of West 65th Street, and he saw two strangers, that he was frightened and remembered nothing until much later.

"There being no contrary evidence to that testimony, you are instructed that plaintiff was an invitee, and the standard of care with respect to an invitee applies to this case * * *.

"Plaintiff has the burden of proving the elements of negligence by a preponderance of evidence.

"Negligence is an act or omission in violation of a duty owed to persons sustaining injury. Everyone has a general legal duty to exercise ordinary care to avoid injuring someone else.

"So, negligence is simply a failure to use ordinary care. What is that? Ordinary care is that degree of care which a reasonably prudent person would have used, taking into consideration all of the facts, circumstances and conditions in which such a person was placed in at the time of the happening in question.

"In determining whether ordinary care was used, you will consider whether the defendant ought to have foreseen under the attending circumstances that the natural and probably [*sic,* probable] result of its acts or omissions would cause someone injury.

"* * *

"The test [for forseeability] is whether in light of all the circumstances a reasonably prudent person would have anticipated that injury and damage was likely to result to someone from the performance or from the non-performance of an act.

"If the defendant by the use of ordinary care should have foreseen some injury, and either would not have acted, or if it did act, would have taken precaution to say avoid the result, then in the performance of the acts or the failure to take such precautions may constitute negligence.

"The driver of a rapid transit car with the right of way must use ordinary care. Therefore, to avoid colliding with a person found on the tracks, the defendant is required to use ordinary care to discover and to avoid danger."

**{¶ 52}** The jury found GCRTA negligent, and awarded Gladon $2,736,915.35 in damages. The total jury award of $2,736,915.35 represented $52,800 in lost wages, $206,565.35 in past medical expenses, $43,000 in future medical expenses, and $2,434,550 for pain and suffering. Thus, most of the jury's damage award was attributable to pain and suffering (*i.e.*, noneconomic losses). The trial court reduced the jury's $2.7 million verdict to $2.5 million to conform with Gladon's amended prayer for relief. Further, pursuant to R.C. 2744.05(B), the trial court trimmed the jury award by an additional $115,544.23 in benefits Gladon had received from collateral sources. GCRTA also requested the trial court to reduce the award for pain and suffering to $250,000 pursuant to R.C. 2744.05(C). The trial court refused, finding that R.C. 2744.05(C) is unconstitutional. On appeal, the court of appeals affirmed the judgment of the trial court. The cause is now before this court pursuant to a discretionary appeal and cross-appeal.

II

The Majority's Analysis

**{¶ 53}** The majority has chosen to decide this case on the basis of a questionable analysis of the common-law classifications of invitee, licensee and trespasser. These artificial common-law categories have *traditionally* been used to determine the scope of the duty owed to an entrant upon a landowner's premises. A question remains, however, whether this court should continue to blindly adhere

20

to this artificial classification system, particularly in light of decisions like the one the majority makes in the case now before us.

{¶ 54} A business invitee is a person who comes upon the premises of another by invitation, express or implied, for some purpose which is beneficial to the owner. See *Light v. Ohio Univ.* (1986), 28 Ohio St.3d 66, 68, 28 OBR 165, 167, 502 N.E.2d 611, 613. The landowner owes the invitee a duty to exercise reasonable care and to protect the invitee by maintaining the premises in a safe condition. *Id.* Conversely, a person who enters the premises of another by permission or acquiescence, for the entrant's own pleasure or benefit, and not by invitation, is a licensee. *Id.* The licensor/landowner owes the licensee no duty except to refrain from willfully and wantonly causing injury. *Id.* A trespasser is a person who enters or remains upon the premises of another without a privilege to do so created by the possessor's consent or otherwise. As in the case of a licensee, the owner or occupier of land owes no duty to a trespasser except to refrain from willfully and wantonly causing injury.

{¶ 55} The majority concedes that Gladon was a business invitee at the time he left the rapid transit train at the West 65th Street platform. However, three members of the majority find that Gladon lost his status as an invitee when he was attacked by two assailants and left on the tracks in or near a state of unconsciousness, and a fourth finds it to be a jury question. Thus, the majority finds that the trial court erred by instructing the jury that Gladon was an invitee at the time of the accident. This conclusion of the majority is clearly in error.

{¶ 56} It is interesting that the plurality *does not* say whether Gladon was a licensee or a trespasser while he was lying on the tracks. The reason the plurality fails to classify Gladon as either a licensee or trespasser should be obvious. Gladon did not enter the track area or remain there for his own pleasure or benefit. Therefore, he could not be considered a licensee. Nor did Gladon lose any privilege

to be on GCRTA's premises simply because he was beaten and placed on the tracks by his assailants. Thus, he could not have been a trespasser.

{¶ 57} Nevertheless, the plurality holds that "[w]here an entrant upon another's land exceeds the scope of the landowner's invitation, the entrant will lose the status of an invitee, and become either a licensee or a trespasser." That may be true under other fact patterns, but it cannot be true here. What the plurality is saying is that where, as here, an invitee is lawfully on the premises of another and, *as a consequence of the criminal acts of a third party*, is placed onto a section of property beyond the scope of the invitation, the invitee loses the status of an invitee and, by the wave of a magic wand, is transformed into either a licensee or trespasser. To support this novel concept, the plurality relies exclusively on Comment *l* to Section 332 of the Restatement of the Law 2d, Torts (1965); *Clary v. McDonald* (1963), 120 Ohio App. 8, 28 O.O.2d 169, 200 N.E.2d 805; and *Sweet v. Clare-Mar Camp, Inc*. (1987), 38 Ohio App.3d 6, 526 N.E.2d 74. Not surprisingly, none of these authorities support the majority's holding in this case. Neither *Clary*, *Sweet*, nor Comment *l* to Section 332 of the Restatement of Torts 2d, *supra*, even remotely stands for the proposition that an invitee is magically converted into a licensee or a trespasser where he or she is placed in a different location on the premises as a direct result of the intervening criminal activities of a third person.

{¶ 58} The plurality also cites the Restatement of Torts 2d, 171, Section 329, to refute Gladon's contention that he remained a business invitee at the time of the accident because he had not entered the track area intentionally. Section 329 of the Restatement pertains to the common-law trespasser classification. However, today's majority never commits to saying that Gladon was ever a trespasser on GCRTA's premises. Thus, I am left to wonder why the plurality even discusses Section 329 of the Restatement of Torts 2d, *supra*. Further, the plurality's citation of the illustration to Section 329 of the Restatement of Torts 2d is equally puzzling. The illustration to Section 329 of the Restatement of Torts 2d, at 172, deals with an

*accidental trespasser* who slips and falls onto a set of train tracks. Clearly, that illustration differs dramatically from the *facts* in the case at bar where Gladon, through no fault of his own, *was placed onto* the train tracks by two assailants.

{¶ 59} The plurality's conclusion that Gladon lost his status as an invitee because of the intervening criminal acts of third parties takes the common-law entrant classification system to an entirely new level of absurdity. Take the following example. Assume that a postal worker is in the process of delivering mail to a homeowner's premises. The postal worker enters upon the porch and slips the mail into the mailbox. At that moment, a burglar leaves the home, beats the postal worker, and then throws the postal worker through the front window of the home and onto the living room couch. The homeowner then returns home and finds the postal worker bleeding to death on the couch—a location on the premises where the postal worker has no right to be. Under the majority's analysis, the homeowner would apparently owe no duty to the postal worker except to refrain from willfully or wantonly causing further injury because the postal worker had magically been transformed from a business invitee to a trespasser or a licensee by the intervening acts of the burglar. I, for one, find the majority's new legal doctrine to be beyond comprehension.

{¶ 60} On several prior occasions, this court has been asked to specifically abolish the legal standards that exist in Ohio with respect to those classified in the law as licensees and social guests, as opposed to those classified as business invitees. On each occasion, we have found it unnecessary to abolish the common-law classifications. See, *e.g*., *Brinkman v. Ross* (1993), 68 Ohio St.3d 82, 85-86, 623 N.E.2d 1175, 1178. Today's plurality opinion is an excellent example why the common-law classification system should be abandoned in favor of a rule of law that imposes a duty on landowners to exercise reasonable care toward all entrants who lawfully come upon the landowner's premises. I would be inclined to abandon the artificial common-law classification system at least in cases where, as here, a

person enters the property of another for the landowner's business benefit and, through no fault of her or his own and by the intervention of a third party, is placed in a different location on the property.

{¶ 61} Moreover, the plurality recognizes that "[w]hen a trespasser or licensee is discovered in a position of peril, a landowner is required to use ordinary care to avoid injuring him." In this regard, the majority also says that "[t]he duty to exercise ordinary care arises after the landowner 'knows, or from facts within his knowledge should know or believe,' that a trespasser or licensee is on the land." Compare these statements to the trial court's actual charge to the jury that "to avoid colliding with a person found [discovered?] on the tracks, the defendant is required to use ordinary care to discover and to avoid danger." I submit that the trial court's charge to the jury comports with even the majority's strained analysis of this case.

{¶ 62} In sum, today's plurality, with one swipe of the pen, makes Gladon either a trespasser or a licensee even though Gladon entered upon GCRTA's property with permission and for the benefit of the GCRTA. The plurality has engaged us in extensive discussion concerning Gladon's legal status, has offered up examples from the Restatement of Torts 2d, and has made certain suppositions concerning Gladon, the activities of GCRTA, and the question of privileged entry. Unfortunately, all of these matters are based on the plurality's assumption that Gladon was either a trespasser or a licensee and, of course, there is no *evidence* in the record to support that assumption. The trial judge and the jury heard all of the facts. The trial judge applied the law based on the facts in evidence—not on suppositions and speculation. The jury deliberated and decided. However, today's majority reweighs all of that and comes to a different conclusion. Obviously, the majority's *de novo* review and evidence weighing is not a proper function of this court.

{¶ 63} Gladon was a paying customer of the GCRTA. He was on GCRTA's premises for GCRTA's business benefit. As the trial court noted, there was *no*

*evidence* in this case suggesting that Gladon was anything but a business invitee at the time of the accident. Accordingly, the trial court was correct to instruct the jury that GCRTA owed Gladon a duty of reasonable care. I cannot join the majority's efforts in this case to usurp the functions of the trial court and the jury. Accordingly, I dissent.

## III

## R.C. 2744.05(C)

{¶ 64} The *real* issue in this case is whether R.C. 2744.05(C) is a constitutional exercise of legislative authority. I would decide that issue. However, because the majority has adroitly avoided any discussion of R.C. 2744.05(C), I offer the following information, hoping to foster scholarly debate on the question of whether R.C. 2744.05(C) violates the right to trial by jury. As indicated above, I present the fruits of my research not so much to persuade as to inquire.

{¶ 65} R.C. 2744.05 provides:

"Notwithstanding any other provision of the Revised Code or rules of a court to the contrary, in an action against a political subdivision to recover damages for injury, death, or loss to persons or property caused by an act or omission in connection with a governmental or proprietary function:

"* * *

"(C)(1) *There shall not be any limitation on compensatory damages that represent the actual loss of the person who is awarded the damages. However, except in wrongful death actions brought pursuant to Chapter 2125. of the Revised Code, damages that arise from the same cause of action, transaction or occurrence, or series of transactions or occurrences and that do not represent the actual loss of the person who is awarded the damages shall not exceed two hundred fifty thousand dollars in favor of any one person.* * * *

"(2) As used in this division, 'the actual loss of the person who is awarded the damages' includes all of the following:

"(a)  All wages, salaries, or other compensation lost by the person injured as a result of the injury, including wages, salaries, or other compensation lost as of the date of a judgment and future expected lost earnings of such a person;

"(b)  All expenditures of the person injured or another person on his behalf for medical care or treatment, for rehabilitation services, or for other care, treatment, services, products, or accommodations that were necessary because of the injury;

"(c)  All expenditures to be incurred in the future, as determined by the court, by the person injured or another person on his behalf for medical care or treatment, for rehabilitation services, or for other care, treatment, services, products, or accommodations that will be necessary because of the injury;

"* * *

"(e)  All expenditures of the person injured or whose property was injured or destroyed or of another person on his behalf in relation to the actual preparation or presentation of the person's claim;

"(f) Any other expenditures of the person injured or whose property was injured or destroyed or of another person on his behalf that the court determines represent an actual loss experienced because of the personal or property injury or property loss.

"'*The actual loss of the person who is awarded the damages'* does not include any fees paid or owed to an attorney for any services rendered in relation to a personal or property injury or property loss, and *does not include any damages awarded for pain and suffering, for the loss of society, consortium, companionship, care, assistance, attention, protection, advice, guidance, counsel, instruction, training, or education of the person injured, for mental anguish, or for any other intangible loss*."  (Emphasis added.)

{¶ 66} I confine my discussion to the issue whether the R.C. 2744.05(C)(1) cap on noneconomic damages violates Section 5, Article I of the Ohio Constitution

(right to trial by jury), although the parties have also briefed and argued the question whether R.C. 2744.05(C)(1) violates the guarantees of due process and equal protection set forth in Section 16, Article I and Section 2, Article I of the Ohio Constitution.

IV

Trial By Jury

{¶ 67} The right to trial by jury derives from Magna Carta. It is reasserted in both the Constitution of the United States and the Constitution of the state of Ohio. For centuries, the right to a jury trial has been held to be a fundamental constitutional right. See *Cleveland Ry. Co. v. Halliday* (1933), 127 Ohio St. 278, 284, 188 N.E. 1, 3. Where the right exists, it is a substantive right, not a mere procedural privilege. See *Kneisley v. Lattimer-Stevens Co*. (1988), 40 Ohio St.3d 354, 356, 533 N.E.2d 743, 746, and *Halliday*, *supra*, at paragraph one of the syllabus.

{¶ 68} The right to trial by jury is one of the most fundamentally democratic institutions in the history of the human race. Throughout history, the right to trial by jury has been considered the crown jewel of our liberty. "For 500 years, trial by jury has been praised as the most cherished institution of free and intelligent government that the world has ever seen and as the best institution for the administration of justice ever devised by the mind of man." 1 Few, In Defense of Trial By Jury (1993) 74. The founders of this great nation held the right to trial by jury in very high esteem. They were willing to sacrifice their very lives to preserve for the people of the United States of America the inestimable right to trial by jury. In the words of United States Supreme Court Justice (now Chief Justice) William J. Rehnquist, "[t]he founders of our Nation considered the right of trial by jury in civil cases an important bulwark against tyranny and corruption, a safeguard too precious to be left to the whim of the sovereign, or, it might be added, to that of the judiciary. * * * Trial by a jury of laymen rather than by the sovereign's judges was

important to the founders because juries represent the layman's common sense * * * and thus keep the administration of law in accord with the wishes and feelings of the community." *Parklane Hosiery Co., Inc. v. Shore* (1979), 439 U.S. 322, 343-344, 99 S.Ct. 645, 657-658, 58 L.Ed.2d 552, 570 (Rehnquist, J., dissenting).

{¶ 69} The Ohio Constitution recognizes the fundamental right to trial by jury in Section 5, Article I, which states:

"The right of trial by jury shall be *inviolate*, except that, in civil cases, laws may be passed to authorize the rendering of a verdict by the concurrence of not less than three-fourths of the jury." (Emphasis added.)

"Inviolate" means free from substantial impairment. Black's Law Dictionary (6 Ed.1990) 826. It is difficult to imagine a more forceful way of saying that the right to trial by jury should in no way be infringed.

{¶ 70} R.C. 2744.05(C)(1) places a cap on the noneconomic damages a plaintiff can recover in an action against a political subdivision of the state. In Ohio, the right to a jury trial includes the right to have the jury not only determine factual issues but also assess damages. See *Sorrell v. Thevenir* (1994), 69 Ohio St.3d 415, 422, 633 N.E.2d 504, 510, and *Miller v. Wikel Mfg. Co.* (1989), 46 Ohio St.3d 76, 81, 545 N.E.2d 76, 81 (Douglas, J., concurring in part and dissenting in part). See, also, McCormick, Handbook on the Law of Damages (1935) 24, Section 6 ("The amount of the damages * * * from the beginning of trial by jury, was a 'fact' to be found by the jurors.") Thus, if Gladon had a constitutionally protected right to a jury trial in his action against GCRTA, any application of R.C. 2744.05(C)(1) to reduce or cap the damages awarded by the jury would be constitutionally impermissible.

{¶ 71} Section 5, Article I of the Ohio Constitution does not guarantee a jury trial in all cases. Rather, "Section 5 of Article I of the Constitution of Ohio only guarantees the right of trial by jury in those cases where it existed previous to its adoption." *Belding v. State ex rel. Heifner* (1929), 121 Ohio St. 393, 169 N.E.

28

301, paragraph one of the syllabus. See, also, *Sorrell, supra,* 69 Ohio St.3d at 421, 633 N.E.2d at 510, wherein this court, citing *Belding*, *supra*, stated: "However, this constitutional provision [Section 5, Article I] does not guarantee a jury trial in all cases, but only for those causes of actions where the right existed at common law at the time the Ohio Constitution was adopted."

{¶ 72} Here, Gladon asserted an action for negligence against GCRTA, a political subdivision of the state. Negligence actions evolved from the common-law action of trespass on the case, and there is no question that the right to trial by jury existed in such actions at the time the Ohio Constitution was adopted. See, generally, *Kneisley*, *supra*, 40 Ohio St.3d at 356-357, 533 N.E.2d at 746. Thus, this alone substantiates the theory that Gladon had a constitutionally protected right to trial by jury in his action against GCRTA. Again, in *Sorrell, supra,* 69 Ohio St.3d at 421, 633 N.E.2d at 510, this court stated that Section 5, Article I guarantees the right to trial by jury "for those *causes of actions* where the right existed at common law at the time the Ohio Constitution was adopted." (Emphasis added.) Following this line of reasoning, R.C. 2744.05(C) could not be applied in the case at bar to reduce the jury's damage award.

{¶ 73} However, the next question that could be asked is whether there existed a right to a jury trial in a negligence action against a *political subdivision* of the state at the time the Ohio Constitution was adopted. If that question can be answered in the negative, it is arguable that Gladon had no constitutionally protected right to a jury trial against GCRTA and, thus, R.C. 2744.05(C) could be applied to reduce the jury's damage award without violating Section 5, Article I of the Ohio Constitution. In this vein, GCRTA suggests that there existed no right to sue a political subdivision at common law because political subdivisions were protected by the concept of sovereign immunity. My research has revealed no unassailable precedent to substantiate GCRTA's assertion. Indeed, there is much evidence to the contrary.

**{¶ 74}** First, it should be noted that the concept of sovereign immunity is applicable in this country (if at all) to the federal and state governments—not to the political subdivisions of the state. See, generally, Prosser & Keeton, Law of Torts (5 Ed.1984) 1033, 1043, 1051, Section 131. Corporate political subdivisions of the state are not sovereign powers. By definition, a "sovereign" is "[a] person, body, or state in which independent and supreme authority is vested." Black's Law Dictionary, *supra*, at 1395. "Sovereignty" means "[t]he supreme, absolute, and uncontrollable power by which any independent state is governed." *Id*. at 1396. In this regard, a political subdivision of a state government cannot by any stretch of the imagination be considered a sovereign power. Nevertheless, I will discuss the topic of sovereign immunity before proceeding to the question whether there existed a common-law right to sue a political subdivision of a state government for negligence.

**{¶ 75}** The history of the doctrine of sovereign immunity in this country is associated with the English common-law concept that "the king can do no wrong." See *Haas v. Hayslip* (1977), 51 Ohio St.2d 135, 140, 5 O.O.3d 110, 113, 364 N.E.2d 1376, 1379 (William B. Brown, J., dissenting).[4] That concept evolved from the personal prerogatives of the King of England, who was considered the fountain of justice and equity in the English common law. In the English feudal system, the lord of the manor was not subject to suit in his own courts. See 1 Pollock & Maitland, The History of English Law (2 Ed.1968) 518. The king, as highest feudal lord, enjoyed this protection on the theory that no court was above him. *Id*. Further, the king was considered the supreme power and was, thus, infallible. His person was considered sacred and the law ascribed him the attribute of sovereignty. Therefore, it was his personal royal prerogative not to be subjected to suit in his

---

4. *Haas v. Hayslip* (1977), 51 Ohio St.2d 135, 5 O.O.3d 110, 364 N.E.2d 1379, was overruled by *Haverlack* v. *Portage Homes, Inc*. (1982), 2 Ohio St.3d 26, 2 OBR 572, 442 N.E.2d 749.

own courts. See, generally, Borchard, Government Liability in Tort (1924), 34 Yale L.J. 1, 4. Accordingly, the king could do no wrong.

**{¶ 76}** Although the notion of sovereign immunity is best suited to a government of royal power, American courts nonetheless accepted the doctrine in the early days of the republic. See Prosser & Keeton, *supra*, at 1033. However, courts and commentators have remained mystified *why* the doctrine was ever accepted in this country. In Borchard's writings on this subject (Borchard, Government Liability in Tort, *supra*, 34 Yale L.J. at 4-5) it is stated that:

"Nothing seems more clear than that this immunity of the King from the jurisdiction of the King's courts was purely personal. How it came to be applied in the United States of America, where the [royal] prerogative is unknown, is one of the mysteries of legal evolution. Admitting its application to the sovereign and its illogical ascription as an attribute of sovereignty generally, it is not easy to appreciate its application to the United States, where the location of sovereignty—undivided sovereignty, as orthodox theory demands—is a difficult undertaking. It is beyond doubt that the Executive in the United States is not historically the sovereign, and the legislature, which is perhaps the depository of the widest powers, is restrained by constitutional limitations. The federal government is one of delegated powers and the states are not sovereign, according to the Constitution, as demonstrated forcibly by the Civil War and the resulting Amendments. That brings us to the only remaining alternative, that sovereignty resides in the American electorate or the people." (Footnotes omitted.) See, also, *Muskopf v. Corning Hosp. Dist*. (1961), 55 Cal.2d 211, 214-216, 11 Cal.Rptr. 89, 90-92, 359 P.2d 457, 458-460.

**{¶ 77}** In his dissenting opinion in *Haas*, *supra*, 51 Ohio St.2d at 140, 5 O.O.3d at 113, 364 N.E.2d at 1379, Justice William B. Brown summed up the entire matter by stating that "[i]t is something of an anomaly that the common-law doctrine of sovereign immunity which is based on the concept that 'the king can do

no wrong' was ever adopted by the American courts." (Footnote omitted.) Further, the United States Supreme Court has also indicated that there is no rational justification in American jurisprudence for the English legal maxim "the King can do no wrong." Specifically, in *Langford v. United States* (1879), 101 U.S. 341, 343, 25 L.Ed. 1010, 1011, the court stated that "[w]e do not understand that either in reference to the government of the United States or of the several States, or of any of their officers, the English maxim has an existence in this country."

{¶ 78} The rule of county or local district immunity did not originate with the concept of sovereign immunity. Indeed, legal authorities seemingly agree that the concept of local governmental immunity can be traced to the English case of *Russell v. Men of Devon* (K.B. 1788), 100 Eng. Rep. 359, and the misapplication of *Russell* by a Massachusetts court in 1812.

{¶ 79} In *Russell*, the plaintiffs' wagon was damaged as a consequence of a bridge being out of repair. The plaintiffs sued the inhabitants of the unincorporated county for trespass on the case. However, the court denied recovery on the basis that the inhabitants were not incorporated and, thus, there was no fund from which a judgment could have been paid. In support of the holding, one member of the court said "that it is better that an individual should sustain an injury than that the public should suffer an inconvenience." *Id.*, 100 Eng. Rep. at 362.

{¶ 80} The rule of *Russell* was first introduced into this country in *Mower v. Inhabitants of Leicester* (1812), 9 Mass. 247. In *Mower*, a stagecoach belonging to the plaintiff, Ephraim Mower, was traveling through the town of Leicester when one of his horses was fatally injured as a consequence of the bridge being out of repair. The plaintiff sued the inhabitants of Leicester, and a verdict was returned in his favor. In contrast to the county in *Russell*, the town of Leicester was incorporated and had a public treasury out of which any judgment could have been paid. However, ignoring the fact that Leicester was incorporated and that *Mower* was thus clearly distinguishable from *Russell*, the Massachusetts court held that no

recovery could be had against the townspeople unless such recovery was authorized by statute. *Id*. at 250. This rule of local government immunity then became the general American rule. See Borchard, Government Liability in Tort, *supra*, 34 Yale L.J. at 41-42; and *Muskopf, supra*, 55 Cal.2d 211, 11 Cal.Rptr. 89, 359 P.2d 457. However, a reading of *Mower* demonstrates that there existed no logical reason in that case for recovery to have been denied. In the words of Justice William B. Brown, "[t]he common-law precedent for municipal immunity (*Russell v. Devon* [1788], 100 Eng. Rep. 359), denied recovery because of the absence of a 'corporation fund' from which satisfaction could be made. Since the *Mower* case did not deal with a lack of a corporate fund, it was essentially decided on the grounds of which party should bear the loss." *Haas*, *supra*, 51 Ohio St.2d at 140, 5 O.O.3d at 113, 364 N.E.2d at 1380, fn. 3 (William B. Brown, J., dissenting).

{¶ 81} My research reveals that *Ohio* courts in the early 1800s did *not* share the view that local government units were immune from liability. Rather, "*[d]uring the period immediately following* Mower *and, indeed, throughout the early 1800's, Ohio courts favored imposition of liability on local governmental units*. Concerned primarily with establishing a rule that promoted 'substantial justice,' Ohio courts considered municipal corporations and individuals equally responsible in tort. Justice was considered served only by spreading the losses inflicted upon private individuals through the execution of governmental activity upon everyone who had shared a benefit from such activity." (Emphasis added and footnote omitted.) Note, Municipal Immunity in Ohio—How Much Wrong Can a Municipality Do? (1984), 15 U.Tol.L.Rev. 1559, 1566. See, also, Comment, The Ohio Political Subdivision Tort Liability Act: A Legislative Response to the Judicial Abolishment of Sovereign Immunity (1986), 55 U.Cin.L.Rev. 501, 502 (The Ohio Supreme Court first introduced the doctrine of municipal sovereign immunity in *1854* and, prior to that time, courts treated Ohio municipalities the same as private individuals when imposing liability for wrongful acts or injuries.); Comment, Can Municipal

Immunity in Ohio be Resurrected From the Sewers After *Haverlack v. Portage Homes, Inc.?* (1983), 13 Cap.U.L.Rev. 41, 42 ("The early Ohio cases which dealt with municipal tort liability did not recognize immunity."); and Celebrezze & Hull, The Rise and Fall of Sovereign Immunity in Ohio (1984), 32 Clev.St.L.Rev. 367, 367-368 ("Municipal corporations have not always been protected by sovereign immunity in Ohio. Instead, early cases held municipalities subject to action in tort as a matter of basic justice.")

{¶ 82} A review of Ohio history demonstrates that the doctrine of sovereign immunity was first applied in Ohio in 1840 in the case of *State v. Franklin Bank of Columbus* (1840), 10 Ohio 91. See Celebrezze & Hull, The Rise and Fall of Sovereign Immunity in Ohio, *supra*, 32 Clev.St.L.Rev. at 369. However, *Franklin Bank of Columbus*, *supra*, involved the liability of the state of Ohio -- not a political subdivision of the state. It was not until the *1854* case of *Dayton v. Pease* (1854), 4 Ohio St. 80, that the doctrine of sovereign immunity was expanded to include political subdivisions (municipal corporations) of the state. See Celebrezze & Hull, The Rise and Fall of Sovereign Immunity in Ohio, *supra*, 32 Clev.St.L.Rev. at 370. See, also, Comment, The Ohio Political Subdivision Tort Liability Act, *supra*, 55 U.Cin.L.Rev. at 502. Prior to our 1854 decision in *Pease, supra,* Ohio courts imposed tort liability on municipal corporations as a matter of basic justice. See Celebrezze & Hull, The Rise and Fall of Sovereign Immunity in Ohio, *supra*, 32 Clev.St.L.Rev. at 367-369; Comment, The Ohio Political Subdivision Tort Liability Act, *supra*, 55 U.Cin.L.Rev. at 502; and Note, Municipal Immunity in Ohio, *supra*, 15 U.Tol.L.Rev. at 1566. For example, research reveals several cases spanning the period from 1831 to 1846 in which this court recognized the right to recover against political subdivisions (municipal corporations) of the state for injuries inflicted upon private individuals. See, *e.g.*, *Goodloe v. Cincinnati* (1831), 4 Ohio 500, *Rhodes v. Cleveland* (1840), 10 Ohio 160, and *McCombs v. Town Council of Akron* (1846), 15 Ohio 475. The case of *Goodloe* was ultimately tried before a jury. See

4 Ohio 514, fn. *Rhodes* and *McCombs*, too, were tried before a jury. Each case involved an action sounding in negligence or, more particularly, an action for trespass on the case.

**{¶ 83}** Additionally, there is some evidence that the common law of this country at the time the Ohio Constitution was adopted in 1851 actually recognized no impediments to recovery against a corporate political subdivision of the state. In *Hack v. Salem* (1963), 174 Ohio St. 383, 392, 23 O.O.2d 34, 38, 189 N.E.2d 857, 862 (Gibson, J., concurring), it is noted that "[i]n the early reported American cases it apparently was assumed, without argument and as a matter of basic justice, that municipal corporations were subject to actions for torts." In Barnett, The Foundations of the Distinction Between Public and Private Functions in Respect to the Common-Law Tort Liability of Municipal Corporations (1937), 16 Oregon L.Rev. 250, 259, it is said that "[t]he earliest reported American case coming to attention that recognized the tort liability of a municipal corporation is *Hoe v. Alexandria* [(1802), 1 Cranch C.C. 90, 12 Fed. Cases 461, No. 6666], decided in 1802, in which no distinction was made between the tort liability of public and private corporations, and the city was held liable [in a jury trial], simply as 'a corporation.'" Furthermore, Justice Gibson's concurrence in *Hack, supra*, 174 Ohio St. at 392, 23 O.O.2d at 39, 189 N.E.2d at 863, makes clear that the early cases in Ohio took the same approach as to tort liability of municipal corporations.

**{¶ 84}** Accordingly, it is clear that, in Ohio, there did exist a right to a jury trial against a political subdivision of the state in 1851 when Section 5, Article I of the Constitution was adopted. In *Belding, supra,* 121 Ohio St. 393, 169 N.E. 301, paragraph one of the syllabus, we held that "*Section 5 of Article I of the Constitution of Ohio only guarantees the right of trial by jury in those cases where it existed previous to its adoption*." (Emphasis added.) Since the right to trial by jury in a suit against a political subdivision of the state did exist prior to 1851, it follows that the right is constitutionally protected. This argument, if accepted, establishes that

Section 5, Article I guarantees the right to trial by jury in tort actions against political subdivisions of the state. Unfortunately, the majority fails to address this question.

**{¶ 85}** Further, even if Ohio courts recognized immunity for corporate political subdivisions at the time of the adoption of the 1851 Ohio Constitution, such immunity apparently originated as an extension of the concept that "the King can do no wrong." However, as shown above, it appears that the historic justification for that English maxim never existed in this country. Therefore, it could be argued that the common law of this country actually recognizes no such impediment to an action against a political subdivision. Alternatively, county or local district immunity could have been predicated on the 1788 case of *Russell v. Men of Devon*, *supra*, 100 Eng. Rep. 359. If so, any grant of immunity might have been the product of an enormous judicial accident. *Russell* does not stand for the proposition that there exists county or local district immunity from liability for negligence. Indeed, just the opposite might be true. That is, a careful reading of *Russell* could very well indicate that recovery most likely would have been allowed had the defendants in the action been an incorporated governmental entity with a public treasury from which a judgment could have been paid. Therefore, it might be said that the common law of this country actually recognizes no rational justification for extending immunity to political subdivisions of the state. Again, the majority deprives us of any answer to these penetrating questions.

**{¶ 86}** Moreover, GCRTA claims that Section 16, Article I of the Ohio Constitution, as amended in 1912, authorized the General Assembly to enact R.C. Chapter 2744 and to define the manner in which political subdivisions may be sued. Section 16, Article I, as amended, provides that:

"All courts shall be open, and every person, for an injury done him in his land, goods, person, or reputation, shall have remedy by due course of law, and shall have justice administered without denial or delay. *Suits may be brought*

*against the state, in such courts and in such manner, as may be provided by law*."
(Emphasis added.)

**{¶ 87}** The second sentence of Section 16, Article I applies to suits against the *state*. Does this also mean that Section 16, Article I applies to suits against political subdivisions of the state? Section 16, Article I certainly does *not* say that. Obviously, this question is one which this court needs to address.

**{¶ 88}** GCRTA also relies on *Fabrey v. McDonald Village Police Dept.* (1994), 70 Ohio St.3d 351, 639 N.E.2d 31, *Menefee v. Queen City Metro* (1990), 49 Ohio St.3d 27, 550 N.E.2d 181, and *Fahnbulleh v. Strahan* (1995), 73 Ohio St.3d 666, 653 N.E.2d 1186, as authority for the proposition that a person has no fundamental right to sue a political subdivision of the state and thus no right to a jury trial. However, GCRTA's reliance on these cases might be misplaced. This is especially true when a close reading of *Fabrey* and *Fahnbulleh* and possibly even *Menefee* reveals that those decisions were founded on the second sentence of Section 16, Article I, which came into existence by way of a 1912 amendment to the Ohio Constitution. That sentence applies only to the state—not political subdivisions of the state. In fact, R.C. 2743.01(A) states that "'[s]tate' does *not* include political subdivisions." (Emphasis added.) This is right from the Court of Claims Act. See, also, R.C. 1.59(G). Further, the three cases involve R.C. 2744.02(B) and R.C. 2744.05(B)—not R.C. 2744.05(*C*).

**{¶ 89}** In *Fabrey*, *supra*, 70 Ohio St.3d at 355, 639 N.E.2d at 34-35, this court stated:

"In *Haverlack* [v. *Portage Homes, Inc.* (1982), 2 Ohio St.3d 26, 2 OBR 572, 442 N.E.2d 749], we recognized that the doctrine of sovereign immunity was a creature of common law, and thus was an appropriate subject also for legislative action. The General Assembly in enacting R.C. Chapter 2744 has used that power to create a scheme for immunity and liability of political subdivisions. Because the General Assembly has the power to define the contours of the *state's* liability,

within the constraints of equal protection and due process, the right to sue the *state* is not fundamental." (Emphasis added.)

{¶ 90} In *Haverlack*, *supra*, 2 Ohio St.3d at 30, 2 OBR at 575, 442 N.E.2d at 752, this court recognized that sovereign or governmental immunity was judicially created and, thus, could be judicially abolished, stating:

"As aptly stated by Justice William B. Brown in *Haas*, *supra*, [51 Ohio St.2d 135, 145, 5 O.O.3d 110, 116, 364 N.E.2d 1379, 1382,] 'the judicially created doctrine of sovereign immunity is a legal anachronism which denies recovery to injured individuals without regard to the municipality's culpability or the individual's need for compensation.' * * *. Because Ohio's sovereign immunity for municipalities was judicially created (see *State v. Franklin Bank of Columbus* [1840], 10 Ohio 91; *Western College of Homeopathic Medicine v. Cleveland* [1861], 12 Ohio St. 375; and *Thacker v. Bd. of Trustees of Ohio State Univ.* [1973], 35 Ohio St. 2d 49, 67-68 [64 O.O.2d 28] [William B. Brown, J., dissenting]), it can be judicially abolished. * * * When we considered sovereign immunity last year, we noted that only six other states adhered to the traditional common law immunity doctrines. *Schenkolewski v. Metroparks System* (1981), 67 Ohio St. 2d 31, 38 [21 O.O.3d 19]. *Stare decisis* alone is not a sufficient reason to retain the doctrine which serves no purpose and produces such harsh results. Therefore, we join with the other states in abrogating the doctrine.

"We hold that the defense of sovereign immunity is not available, *in the absence of a statute providing immunity*, to a municipal corporation in an action for damages alleged to be caused by the negligent operation of a sewage treatment plant. A municipal corporation, *unless immune by statute*, is liable for its negligence in the performance or nonperformance of its acts." (Emphasis added.)

{¶ 91} *Haverlack* implies that "sovereign immunity for municipalities" was accepted in this state by 1840 in *Franklin Bank of Columbus, supra,* 10 Ohio 91. However, *Franklin Bank of Columbus* actually says that no suit can be brought

against the state -- not a political subdivision of the state. The other early case cited by the *Haverlack* court as creating "sovereign immunity for municipalities" was *W. College of Homeopathic Medicine, supra,* 12 Ohio St. 375, which did involve the liability of a political subdivision of the state, *but which was decided after the adoption of Section 5, Article I of the Ohio Constitution*. It is also important to recognize that *Haverlack* adopted the historical analysis of sovereign or governmental immunity set forth in Justice William Brown's dissent in *Haas*, *supra*, 51 Ohio St.2d at 140-145, 5 O.O.3d at 113-116, 364 N.E.2d at 1379-1382, and the analysis of Justice Gibson's concurrence in *Hack, supra,* 174 Ohio St. 383, 391-402, 23 O.O.2d 34, 38-45, 189 N.E.2d 857, 862-869, wherein it was essentially argued that municipal immunity has no rational justification in the common law of this country.

{¶ 92} Therefore, the statement in *Fabrey, supra,* 70 Ohio St.3d at 355, 639 N.E.2d at 34-35, indicating that there is no fundamental right to sue a political subdivision of the state, and that the General Assembly can control the means by which political subdivisions are sued, might not have taken into consideration the constitutional right to trial by jury. The same might be true with respect to the case of *Menefee*, *supra*, 49 Ohio St.3d 27, 29, 550 N.E.2d 181, 182, wherein this court indicated that it is within the power of the state to extend immunity to all claims against a political subdivision. Likewise, *Fahnbulleh, supra,* 73 Ohio St.3d 666, 653 N.E.2d 1186, did not involve any question concerning the right to trial by jury. Indeed, a review of the history of the right to trial by jury and the concept of sovereign immunity could lead any interested reader to question *why* this court indicated in *Haverlack, supra,* 2 Ohio St.3d 26, 2 OBR 572, 442 N.E.2d 749, that it was within the realm of the legislature to enact statutes immunizing political subdivisions from tort liability. Again, there is at least some authority to suggest that the Ohio legislature (and the Ohio courts for that matter) never had any

authority whatsoever to provide immunity to political subdivisions of this state at the expense of the people's right to trial by jury.

{¶ 93} In any event, this court or any other court faced with the question whether R.C. 2744.05(C) violates Section 5, Article I of the Ohio Constitution would do well to observe the tremendous value the people of our state and nation place on the right to trial by jury. The right to trial by jury, where it exists, cannot be compromised. To compromise that right in any manner would crack the foundation of our individual liberties.

{¶ 94} On July 4, 1776, our founding fathers declared independence from the British Crown. One of the specific causes that impelled them to do so was the act of King George III in attempting to deprive the people of the United States of the benefits to trial by jury. Although the Declaration of Independence is over two hundred years old, the document continues to speak with great clarity and wisdom. It continues to define our very existence as a free and independent nation. We must remain mindful of that historic document,[5] which provides:

"When in the Course of human events, it becomes necessary for one people to dissolve the political bands which have connected them with another, and to assume among the powers of the earth, the separate and equal station to which the Laws of Nature and of Nature's God entitle them, a decent respect to the opinions of mankind requires that they should declare the causes which impel them to the separation.

"We hold these truths to be self-evident, that all men are created equal, that they are endowed by their Creator with certain unalienable Rights, that among these are Life, Liberty and the pursuit of Happiness. That to secure these rights, Governments are instituted among Men, deriving their just powers from the consent

---

5. The Declaration of Independence is reproduced in Page's Ohio Revised Code Annotated, Appendix (1994) 405-406, and in Baldwin's Ohio Revised Code Annotated, 1 Constitutions (1995) 21-24.

of the governed,—That whenever any Form of Government becomes destructive of these ends, it is the Right of the People to alter or to abolish it, and to institute new Government, laying its foundation on such principles and organizing its powers in such form, as to them shall seem most likely to effect their Safety and Happiness. Prudence, indeed, will dictate that Governments long established should not be changed for light and transient causes; and accordingly all experience hath shewn, that mankind are more disposed to suffer, while evils are sufferable, than to right themselves by abolishing the forms to which they are accustomed. But when a long train of abuses and usurpations, pursuing invariably the same Object evinces a design to reduce them under absolute Despotism, it is their right, it is their duty, to throw off such Government, and to provide new Guards for their future security.--Such has been the patient sufferance of these Colonies; and such is now the necessity which constrains them to alter their former Systems of Government. The history of the present King of Great Britain is a history of repeated injuries and usurpations, all having in direct object the establishment of an absolute Tyranny over these States. To prove this, let Facts be submitted to a candid world.

"He has refused his Assent to Laws, the most wholesome and necessary for the public good.

"He has forbidden his Governors to pass Laws of immediate and pressing importance, unless suspended in their operation till his Assent should be obtained; and when so suspended, he has utterly neglected to attend to them.

"He has refused to pass other Laws for the accommodation of large districts of people, unless those people would relinquish the right of Representation in the Legislature, a right inestimable to them and formidable to tyrants only.

"He has called together legislative bodies at places unusual, uncomfortable, and distant from the depository of their public Records, for the sole purpose of fatiguing them into compliance with his measures.

"He has dissolved Representative Houses repeatedly, for opposing with manly firmness his invasions of the rights of the people.

"He has refused for a long time, after such dissolutions, to cause others to be elected; whereby the Legislative powers, incapable of Annihilation, have returned to the People at large for their exercise; the State remaining in the mean time exposed to all the dangers of invasion from without, and convulsions within.

"He has endeavoured to prevent the population of these States; for that purpose obstructing the Laws for Naturalization of Foreigners; refusing to pass others to encourage their migration hither, and raising the conditions of new Appropriations of Lands.

"He has obstructed the Administration of Justice, by refusing his Assent to Laws for establishing Judiciary powers.

"He has made Judges dependent on his Will alone, for the tenure of their offices, and the amount and payment of their salaries.

"He has erected a multitude of New Offices, and sent hither swarms of Officers to harass our people, and eat out their substance.

"He has kept among us, in times of peace, Standing Armies without the Consent of our legislature.

"He has affected to render the Military independent of and superior to the Civil power.

"*He has combined with others to subject us to a jurisdiction foreign to our constitution, and unacknowledged by our laws; giving his Assent to their Acts of pretended Legislation*:

"For quartering large bodies of armed troops among us:

"For protecting them, by a mock Trial, from punishment for any Murders which they should commit on the Inhabitants of these States:

"For cutting off our Trade with all parts of the world:

"For imposing taxes on us without our Consent:

"*For depriving us in many cases, of the benefits of Trial by Jury*:

"For transporting us beyond Seas to be tried for pretended offences:

"For abolishing the free System of English Laws in a neighbouring Province, establishing therein an Arbitrary government, and enlarging its Boundaries so as to render it at once an example and fit instrument for introducing the same absolute rule into these Colonies:

"For taking away our Charters, abolishing our most valuable Laws, and altering fundamentally the Forms of our Government:

"For suspending our own Legislatures, and declaring themselves invested with power to legislate for us in all cases whatsoever.

"He has abdicated Government here, by declaring us out of his Protection and waging War against us.

"He has plundered our seas, ravaged our Coasts, burnt our towns, and destroyed the lives of our people.

"* * *

"In every stage of these Oppressions We have Petitioned for Redress in the most humble terms: Our repeated Petitions have been answered only by repeated injury.  A Prince, whose character is thus marked by every act which may define a Tyrant, is unfit to be the ruler of a free people.

"Nor have We been wanting in attention to our Brittish brethren.  We have warned them from time to time of attempts by their legislature to extend an unwarrantable jurisdiction over us.  We have reminded them of the circumstances of our emigration and settlement here.  We have appealed to their native justice and magnanimity, and we have conjured them by the ties of our common kindred to disavow these usurpations, which, would inevitably interrupt our connections and correspondence.  They too have been deaf to the voice of justice and of consanguinity.  We must, therefore, acquiesce in the necessity, which denounces

our Separation, and hold them, as we hold the rest of mankind, Enemies in War, in Peace Friends.

"We, therefore, the Representatives of the United States of America, in General Congress, Assembled, appealing to the Supreme Judge of the world for the rectitude of our intentions, do, in the Name, and by Authority of the good People of these Colonies, solemnly publish and declare, That these United Colonies are, and of Right ought to be Free and Independent States; that they are Absolved from all Allegiance to the British Crown, and that all political connection between them and the State of Great Britain, is and ought to be totally dissolved * * *. And for the support of this Declaration, with a firm reliance on the protection of Divine Providence, we mutually pledge to each other our Lives, our Fortunes and our sacred Honor." (Emphasis added.)

{¶ 95} We should also remain mindful of those brave souls who placed their signatures on the Declaration of Independence, including John Hancock, John Adams, Benjamin Franklin, Thomas Jefferson, and Button Gwinnett. These great men and the document that they signed should forever remind us that there is nothing to be gained, and there is everything to lose, by infringing upon the sacred and fundamental right to trial by jury. Accordingly, if in the face of all of this the majority believes that R.C. 2744.05(C) is constitutional, then the majority should so hold. *If*, however, R.C. 2744.05(C) is unconstitutional, today's majority should muster the courage to say so and should do everything in its power to preserve the precious right to trial by jury. Yet, today's majority has not even taken the time to consider these important issues. That is truly unfortunate. I must respectfully dissent![6]

---

6. In addition to not deciding the real issues raised in appellant's (GCRTA's) appeal concerning the constitutionality of R.C. 2744.05(C), the majority addresses *none* of the issues raised in Gladon's cross-appeal. Those issues include whether R.C. 2744.05(B) is unconstitutional on the basis of Section 5, Article I of the Ohio Constitution. Clearly, the majority should have addressed these issues head-on rather than skirting them on the basis of an improper analysis of the archaic common-

V

Conclusion

**{¶ 96}** I recognize that some persons will have vigorous disagreement with some or all I have set forth herein. I accept that, but all I ask is for that disagreement to be argued on the basis of law -- not emotion. I maintain an open mind and am willing to be persuaded. After all, I come from nineteen years of service in the legislative body of a political subdivision, so my natural predilection is towards sovereign immunity. That predilection, however, cannot be permitted to supersede the law.

**{¶ 97}** I conclude, then, by asking, if the doctrine of sovereign immunity is a valid and workable rule of law, why then have so many exceptions, both legislatively and judicially, been created to the rule? The very latest example of this is found in *Semadeni v. Ohio Dept. of Transp.* (1996), 75 Ohio St.3d 128, 661 N.E.2d 1013. Might it be that the rule is not only unfair but that it was never solidly grounded in American and Ohio jurisprudence? Given the majority opinion, we will never know—at least not for now.

RESNICK and PFEIFER, JJ., concur in the foregoing dissenting opinion.

---

law entrant classification system. I would decide all of the issues presented in both the appeal and the cross-appeal. However, because the majority does not address all of the various issues in this case, neither do I.