TUDOR, Appellee,

v.

CITY OF CINCINNATI, Appellant.

[Cite as *Tudor v. Cincinnati* (1998), 130 Ohio App.3d 805.]

Court of Appeals of Ohio,
First District, Hamilton County.

No. C–980018.

Decided Dec. 18, 1998.

*Cliff G. Linn*, for appellee.

*Fay D. Dupuis*, City Solicitor, and *Richard Ganulin*, Assistant City Solicitor, for appellant.

PAINTER, Judge.

Plaintiff-appellee Mitcheal B. Tudor filed a negligence lawsuit against defendant-appellant city of Cincinnati after he fell several stories down an empty, unguarded elevator shaft in Queensgate II Town Center ("Queensgate II"), a building held by the city for urban-renewal purposes. He claimed that he entered the building to avoid two men who he believed were following him and who he felt posed a danger to him. Although the building was fenced off, he claimed that he entered it through a gap in the fence and that there were not any visible "no trespassing" signs. He also claimed that on many occasions he had seen people on top of the building and that graffiti was visible on the building.

The city responded to Tudor's allegations with a motion for summary judgment. The city argued both that it was immune from Tudor's negligence claims

and that Tudor had not presented sufficient evidence to create a genuine issue of material fact regarding his negligence claims. The trial court, however, denied the city's motion. The city now appeals that decision under R.C. 2744.02(C), which provides that an order denying a political subdivision an alleged immunity from liability is a final order.[1] The city asserts three assignments of error.

In the city's first assignment, it argues that the trial court erred by ruling that the city was not immune from Tudor's lawsuit. Under R.C. 2744.02(A)(1), the Political Subdivision Tort Liability Act, political subdivisions of Ohio are generally immune from liability for tort. claims in connection with a governmental function. But an exception to this general rule exists for injuries that occur in buildings that are used in connection with a governmental function. Specifically, R.C. 2744.02(B)(4) provided:

"[P]olitical subdivisions are liable for injury, death, or loss to persons or property that is caused by the negligence of their employees and that occurs within or on the grounds of buildings that are used in connection with the performance of a governmental function, including, but not limited to, office buildings and courthouses, but not including jails, places of juvenile detention, workhouses, or any other detention facility, as defined in section 2921.01 of the Revised Code."[2]

The city argues that the trial court incorrectly held that R.C. 2744.02(B)(4) applies in this case. We believe that the trial court was correct.

The city attacks the application of R.C. 2744.02(B)(4) on three grounds. First, the city argues that R.C. 2744.02(B)(4) applies only to "buildings" and that Queensgate II, which the city classifies as an open-air concrete structure, is not a building as envisioned by the statute. This argument, however, is without merit because words of a statute must be taken in their usual, normal, or customary meaning.[3] Considering that Webster's Dictionary defines a building as "a constructed edifice designed to stand more or less permanently,"[4] which describes Queensgate II, we reject the city's first argument.

---

**1.** We have *sua sponte* removed this case from the accelerated calendar. Reporter's Note: This case was decided prior to *Burger v. Cleveland Hts.* (1999), 87 Ohio St.3d 188, 718 N.E.2d 912.

**2.** The language quoted in the text was in effect when the cause of action in this case arose. 145 Ohio Laws, Part II 2215, 2216. Since that time, the language of R.C. 2744.02(B)(4) has been modified to specifically encompass damages that are caused by "physical defects" within or on the grounds of governmental buildings.

**3.** See *State v. Cravens* (1988), 42 Ohio App.3d 69, 72, 536 N.E.2d 686, 689.

**4.** Webster's Third New International Dictionary (1993) 292.

■ The city's second argument is that, even if Queensgate II is a building, R.C. 2744.02(B)(4) applies only to buildings that are open to the public. The only cases that support this proposition, however, are ones that involve *private residences* where governmental functions are performed.[5] In these cases, the courts do suggest that R.C. 2744.02(B)(4) applies only to buildings that are open to the public.[6] But these courts appear to suggest this proposition merely to distinguish private residences from public buildings—an example of wording that makes sense in the case being decided, but which can be misconstrued in future cases. We understand these cases to refer to *private* property incidentally used for a governmental purpose.

In fact, in cases that involve public buildings, courts follow the plain language of R.C. 2744.02(B)(4).[7] Specifically, R.C. 2744.02(B)(4) applies to "buildings that are used in connection with the performance of a governmental function." The statute does not expressly limit its application to buildings that are open to the public. If we were to accept the city's argument, we would be creating a new category of buildings: public buildings not held for active governmental functions. Such a category is neither envisioned under the Political Subdivision Tort Liability Act nor suggested by courts.

In the present case, Queensgate II is not a private residence. It is a public building being held by the city for a governmental function, urban-renewal purposes.[8] Thus, Queensgate II falls under the plain language of R.C. 2744.02(B)(4). We reject the city's second argument.

The city's third argument is that R.C. 2744.02(B)(4), which applies to injuries caused by the negligence of the city's employees, does not apply here because this is not really a negligence case. The city argues that Tudor was a trespasser in Queensgate II and that, because he was a trespasser, the city had only a duty not to willfully or wantonly injure him. According to the city, R.C. 2744.02(B)(4) does not apply because it covers only cases involving negligence, not cases involving a willful-or-wanton-misconduct standard of care. The city's argument, however, is

---

**5.** See, *e.g.*, *Hackathorn v. Springfield Local School Dist. Bd. of Edn.* (1994), 94 Ohio App.3d 319, 640 N.E.2d 882 (wrongful-death case in which decedent died in a private residence where a public school vocational class was performing renovations); *McCloud v. Nimmer* (1991), 72 Ohio App.3d 533, 595 N.E.2d 492 (involving a plaintiff who was accidentally shot by a police officer in a government-subsidized private residence).

**6.** *Hackathorn, supra*, 94 Ohio App.3d at 325, 640 N.E.2d at 885; *McCloud, supra*, 72 Ohio App.3d at 539, 595 N.E.2d at 496.

**7.** See, *e.g.*, *Trutza v. Cleveland* (1995), 102 Ohio App.3d 371, 375, 657 N.E.2d 327, 330 (public firehouse); see, also, *Jones v. Lucas Metro. Hous. Auth.* (Aug. 29, 1997), Lucas App. No. L–96–212, unreported, 1997 WL 543049 (disagreeing with *Hackathorn* and *McCloud* ).

**8.** See R.C. 2744.01(C)(2)(q).

specious because it assumes that a case is no longer a negligence case merely because there is a different standard of care.

Under negligence law, the plaintiff must show a duty of care, the breach of the duty, the proximate cause of the injury, and damages.[9] Depending on the status of the plaintiff, different standards of care might apply. In some cases, such as when the plaintiff is an invitee on the defendant's premises, the defendant has a duty of ordinary care. In other cases, such as when the plaintiff is an undiscovered trespasser, the defendant has a duty to refrain from willful or wanton misconduct.[10] Although these categories have been seriously questioned and may someday fall to a general reasonableness standard, the Ohio Supreme Court has recently reaffirmed its adherence to these ancient common-law distinctions of duty that are relics from the English feudal system.

Although the standard of care might differ from case to case, the cases still involve negligence in general. The standard of care is merely one element of a negligence case. Here, the standard of care might involve the duty to refrain from willful or wanton misconduct. But the case still sounds in negligence.

Furthermore, contrary to the city's argument, this case might not even involve a willful-or-wanton-misconduct standard of care. There is a distinction between undiscovered and discovered trespassers, a principle that the trial court did not mention. If one is an undiscovered trespasser, then the landowner has a duty to refrain from willful or wanton misconduct. On the other hand, if a landowner knows or should know that trespassers have been on his land, then these persons are discovered trespassers to whom the landowner owes the duty of ordinary care to warn of danger.[11] In this case, Tudor claims that on many occasions he had seen people on top of Queensgate II and that graffiti was visible on the building. Because the city might have been aware of trespassers in the building, a question of fact remains as to whether Tudor was a discovered trespasser to whom a standard of ordinary care would apply. In short, the city's arguments are not well taken. We overrule the city's first assignment.

---

**9.** *Texler v. D.O. Summers Cleaners & Shirt Laundry Co.* (1998), 81 Ohio St.3d 677, 680, 693 N.E.2d 271, 274.

**10.** *Gladon v. Greater Cleveland Regional Transit Auth.* (1996), 75 Ohio St.3d 312, 315, 662 N.E.2d 287, 291.

**11.** *Gladon, supra,* 75 Ohio St.3d at 317–318, 662 N.E.2d at 293; *Phillips v. Dayton Power & Light Co.* (1994), 93 Ohio App.3d 111, 117–119, 637 N.E.2d 963, 967–968; *Whitener v. Firwood Invest. Co.* (Sept. 13, 1995), Montgomery App. No. 14938, unreported, 1995 WL 544772.

■ The city's second assignment is that the trial court erroneously applied the doctrine of *res ipsa loquitur* in this case. The trial court, however, did not base its denial of the city's motion for summary judgment on *res ipsa loquitur*. In fact, the trial court did not even mention the doctrine. Rather, the trial court held that an issue of material fact exists as to whether the city had negligently maintained the elevator shaft and the premises surrounding Queensgate II. We overrule the city's second assignment.

■ The city's third assignment is that Tudor did not produce sufficient evidence to create a material issue of fact regarding the city's alleged negligence. The city argues that Tudor presented no evidence that the city acted in a willful or wanton manner. We conclude, however, that the city did not satisfy Civ.R. 56's requirement of showing that no material issues of fact exist. As explained in regard to the city's first assignment, if the factfinder considers Tudor a discovered trespasser, then he will not need to prove that the city acted in a willful or wanton manner. Rather, he will only have to show that the city failed to exercise ordinary care in warning him of danger. We hold that a genuine issue of fact remains regarding whether the city adequately warned Tudor of potential dangers in Queensgate II and whether the city maintained the premises, both inside and outside the building, in a reasonable manner.

■ Also, even if Tudor were an undiscovered trespasser, we hold that a genuine issue of fact exists as to whether the city acted willfully or wantonly. The terms "willful" and "wanton" are considered "points on a continuum between negligence, which conveys the idea of inadvertence, and intentional misconduct." [12] Wanton misconduct "is a degree greater than negligence." [13] "Willful misconduct" implies intent. But "the intention relates to the misconduct, not to the result, and, therefore, an intent to injure need not be shown." [14] Here, we conclude that the city's alleged failure to warn of dangers in Queensgate II and its alleged failure to maintain the premises in a safe condition could have risen to willful or wanton misconduct. The city's third assignment of error is overruled.

Therefore, the judgment of the trial court is affirmed.

*Judgment affirmed.*

---

12. *Brockman v. Bell* (1992), 78 Ohio App.3d 508, 515, 605 N.E.2d 445, 449; *Baber v. Dennis* (1979), 66 Ohio App.2d 1, 7, 20 O.O.3d 28, 31–32, 419 N.E.2d 16, 20; *Tighe v. Diamond* (1948), 149 Ohio St. 520, 526, 37 O.O. 243, 246, 80 N.E.2d 122, 126–127.

13. *Brockman, supra,* 78 Ohio App.3d at 515, 605 N.E.2d at 449.

14. *Id.*

Doan, J., concurs.

Sundermann, P.J., dissents.

Sundermann, Presiding Judge, dissenting.

I respectfully dissent. The facts are not in dispute. In my view, the second and third assignments of error would be moot in that I would grant the city's first assignment and hold it immune under R.C. 2744.02.

The building in this case is fenced off and vacant. It is being held by the city for urban-renewal purposes. R.C. 2744.02(B)(4) provided:

"[P]olitical subdivisions are liable for injury, death, or loss to persons or property that is caused by the negligence of their employees and that occurs within or on the grounds of buildings *that are used in connection with the performance of a governmental function*, including, but not limited to, office buildings and courthouses, but not including jails, places of juvenile detention, workhouses, or any other detention facility, as defined in section 2921.01 of the Revised Code." (Emphasis added.)

The plain language of the statute says that this exception was created for buildings that are actually used for governmental purposes. By way of example, the statute specifically mentions office buildings and courthouses. These are the type of buildings the statute was meant to cover, not abandoned, vacant ones. I would reverse on the first assignment of error.