[Cite as *Price v. Frederick C. Smith Clinic*, 2010-Ohio-4551.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## MARION COUNTY

THELMA PRICE,                                    CASE NO. 9-10-13

   PLAINTIFF-APPELLANT,

 v.

THE FREDERICK C. SMITH                    O P I N I O N
CLINIC, ET AL.,

   DEFENDANTS-APPELLEES.


**Appeal from Marion County Common Pleas Court
Trial Court No. 09 CV 0277**

**Judgment Reversed and Cause Remanded**

**Date of Decision:  September 27, 2010**


**APPEARANCES:**

   *Robert E. Wilson,* **for Appellant**

   *James P. Myers,* **for Appellees**

**SHAW, J.**

{¶1} Plaintiff-appellant, Thelma Price ("Price"), appeals the January 20, 2010 judgment of the Common Pleas Court of Marion County, Ohio, granting summary judgment in favor of Defendants-appellees, The Frederick C. Smith Clinic and Clinic Investment LLC (collectively hereinafter "the clinic") and dismissing her complaint against them.

{¶2} On September 19, 2005, Price, who was ninety-years old, went to see her physician at the clinic. After the appointment, Price's granddaughter, who drove Price to her appointment, went to get the car while Price waited in the clinic lobby. Upon seeing her granddaughter drive up, Price, who uses a walker, began to exit the lobby through the automatic sliding doors located at the main entrance of the clinic. As Price was in the threshold of the interior set of doors, she felt something against her right hand. When she looked at her hand, she noticed that the automatic door was closing on her. Price raised her arm to stop the door but it continued to close, knocking both Price and her walker to the floor. As a result of this fall, Price's right leg was broken.

{¶3} Price filed a complaint in the Marion County Common Pleas Court on September 6, 2007, against the clinic for the injuries she sustained from the accident. However, Price voluntarily dismissed her complaint pursuant to Civ.R.

41(A)(2) on June 12, 2008. On March 31, 2009, Price re-filed her complaint against the clinic. The clinic filed its answer to Price's complaint.

{¶4} On November 9, 2009, the clinic filed a motion for summary judgment. In its motion, the clinic asserted that Price could not demonstrate that the clinic breached any duty it owed to Price. In addition, the clinic maintained that the automatic sliding doors were an open and obvious danger, thereby eliminating any duty that the clinic may have owed to Price. Price responded to this motion on December 31, 2009. Thereafter, the clinic filed its reply brief in support of its motion for summary judgment.

{¶5} The trial court granted summary judgment in favor of the clinic on January 20, 2010, and dismissed Price's complaint. This appeal followed, and Price now asserts two assignments of error.

## ASSIGNMENT OF ERROR I

**THE TRIAL COURT FAILED TO APPLY THE DOCTRINE OF RES IPSA LOQUITUR TO THE PREMATURE CLOSING OF THE AUTOMATIC SLIDING GLASS DOORS WHICH CAUSED INJURY TO THE PLAINTIFF WHICH WOULD DEFEAT DEFENDANTS' MOTION FOR SUMMARY JUDGMENT.**

## ASSIGNMENT OF ERROR II

**THERE IS A QUESTION OF FACT OF WHETHER A BUSINESS OWNER IS NEGLIGENT WHEN THE OWNER OF THE BUSINESS HAS PREVIOUSLY BEEN ADVISED THAT ITS AUTOMATIC SLIDING GLASS DOORS PREMATURELY CLOSED ON A BUSINESS INVITEE AND**

**FAILS TO REMEDY THAT HAZARD WHICH CAUSES AN INJURY TO A SUBSEQUENT BUSINESS INVITEE.**

{¶6} For ease of discussion, we elect to address these assignments of error out of the order in which they appear.

*Second Assignment of Error*

{¶7} In Price's second assignment of error, she contends that the trial court erred in granting summary judgment in favor of the clinic because there was a genuine issue of material fact as to whether the clinic breached the duty of care it owed to her based upon its prior knowledge of the premature closing of the automatic doors and failure to remedy this hazard. An appellate court reviews a grant of summary judgment de novo, without any deference to the trial court. *Conley-Slowinski v. Superior Spinning & Stamping Co.* (1998), 128 Ohio App.3d 360, 363, 714 N.E.2d 991; see, also, *Hasenfratz v. Warnement*, 3rd Dist. No. 1-06-03, 2006-Ohio-2797, citing *Lorain Nat'l. Bank v. Saratoga Apts.* (1989), 61 Ohio App.3d 127, 572 N.E.2d 198. A grant of summary judgment will be affirmed only when the requirements of Civ.R. 56(C) are met. This requires the moving party to establish that

> **when, looking at the evidence as a whole, (1) no genuine issue of material fact remains to be litigated, (2) the moving party is entitled to judgment as a matter of law, and (3) it appears from the evidence, construed most strongly in favor of the nonmoving party, that reasonable minds could only conclude in favor of the moving party.**

*Horton v. Harwick Chem. Corp.*, 73 Ohio St.3d 679, 1995-Ohio-286, paragraph three of the syllabus, 653 N.E.2d 1196; see, also, Civ.R. 56(C).

{¶8} The party moving for summary judgment bears the initial burden of identifying the basis for its motion in order to allow the opposing party a "meaningful opportunity to respond." *Mitseff v. Wheeler* (1988), 38 Ohio St.3d 112, 526 N.E.2d 798, syllabus. The moving party also bears the burden of demonstrating the absence of a genuine issue of material fact as to an essential element of the case. *Dresher v. Burt*, 75 Ohio St.3d 280, 292, 1996-Ohio-107, 662 N.E.2d 264. Once the moving party demonstrates that he is entitled to summary judgment, the burden shifts to the non-moving party to produce evidence on any issue which that party bears the burden of production at trial. See Civ.R. 56(E).

{¶9} In ruling on a summary judgment motion, a court is not permitted to weigh evidence or choose among reasonable inferences, rather, the court must evaluate evidence, taking all permissible inferences and resolving questions of credibility in favor of the non-moving party. *Jacobs v. Racevskis* (1995), 105 Ohio App.3d 1, 7, 663 N.E.2d 653. Additionally, Civ.R.56(C) mandates that summary judgment shall be rendered if the pleadings, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence, and written stipulations of fact show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

{¶10} To prevail in a negligence action, a plaintiff must demonstrate that: (1) the defendant owed a duty of care to the plaintiff, (2) the defendant breached that duty, and (3) the defendant's breach proximately caused the plaintiff to be injured. *Lang v. Holly Hill Motel, Inc.*, 122 Ohio St.3d 120, 2009-Ohio-2495, 909 N.E.2d 120, at ¶ 10, citations omitted. The applicable duty is determined by the relationship between the landowner and the plaintiff when the alleged negligence occurs in a premises-liability context. *Id.*, citing *Gladon v. Greater Cleveland Regional Transit Auth.*, 75 Ohio St.3d 312, 315, 1996-Ohio-137, 662 N.E.2d 287. Here, the parties do not dispute that Price was a business invitee of the clinic.

{¶11} "A shopkeeper ordinarily owes its business invitees a duty of ordinary care in maintaining the premises in a reasonably safe condition and has the duty to warn its invitees of latent or hidden dangers." *Armstrong v. Best Buy Co., Inc.*, 99 Ohio St.3d 79, 2003-Ohio-2573, 788 N.E.2d 1088, at ¶ 5, citing *Paschal v. Rite Aid Pharmacy, Inc.* (1985), 18 Ohio St.3d 203, 480 N.E.2d 474; *Jackson v. Kings Island* (1979), 58 Ohio St.2d 357, 390 N.E.2d 810. In a premises-liability action, the plaintiff can prove the defendant's breach of duty if any one of three conditions is satisfied:

> **(1) the defendant, through its officers or employees, was responsible for the hazard complained of; (2) at least one of such persons had actual knowledge of the hazard and neglected to give adequate notice of its presence or to remove it promptly; or (3) such danger existed for a sufficient length of time reasonably to justify the inference that the failure to warn against it or remove it was attributable to a want of ordinary care.**

*Gouhin v. Giant Eagle*, 10th Dist. No. 07AP-548, 2008-Ohio-766, at ¶ 8, citing, *Sharp v. Anderson's, Inc.*, 10th Dist. No. 06AP81, 2006-Ohio-4075, at ¶ 7, citing *Johnson v. Wagner Provision Co.* (1943), 141 Ohio St. 584, 589, 49 N.E.2d 925. Further, "[w]hen it is shown that the owner had superior knowledge of the particular danger which caused the injury, liability attaches because, in such a case, invitees may not reasonably be expected to protect themselves from a risk they cannot fully appreciate." *Hairston v. Gary K. Corp.*, 8th Dist. No. 87199, 2006-Ohio-5566, at ¶ 10, citing *Mikula v. Slavin Tailors* (1970), 24 Ohio St.2d 48, 263 N.E.2d 316; *LaCourse v. Fleitz* (1986), 28 Ohio St.3d 209, 503 N.E.2d 159; see, also, *Cochran v. Ohio Auto Club* (Oct. 3, 1996), 3rd Dist. No. 9-96-33, 1996 WL 562055.

**{¶12}** Moreover,

> **[i]n *Perry v. Eastgreen Realty Co.* (1978), 53 Ohio St.2d 51, a per curiam opinion, at pages 52 and 53, it is stated: "* * * once the evidence establishes that a dangerous condition existed, and that it is a condition about which the owner should have known, evidence of actual knowledge on his part is unnecessary.**
> **'The occupier is not an insurer of the safety of invitees, and his duty is only to exercise reasonable care for their protection. But the obligation of reasonable care is a full one, applicable in all respects, and extending to everything that threatens the invitee with an unreasonable risk of harm. The occupier must not only use care not to injure the visitor by negligent activities, and warn him of latent dangers of which the occupier knows, but he must also inspect the premises to discover possible dangerous conditions of which he does not know, and take reasonable precautions to protect the invitee from dangers which are foreseeable from the arrangement or**

**use. The obligation extends to the original construction of the premises, where it results in a dangerous condition.' Prosser on Torts (4 Ed.), 392-93 (1971). See, also, *Peaster v. William Sikes Post No. 4825 V.F.W.* (1966), 113 Ga.App. 211, 147 S.E.2d 686, 687-8; *De Weese v. J.C. Penney Co.* (1956), 5 Utah 2d 116, 297 P.2d 898, 901; *Gallagher v. St. Raymond's Roman Catholic Church* (1968), 21 N.Y.2d 554, 236 N.E.2d 632, 633-34 (so changing the pre-existing common law as to require outdoor lighting where none had been requisite); *F.W. Woolworth Co. v. Bland* (1933), 22 Ohio Law Abs. 660, 660-61; 39 Ohio Jurisprudence 2d 586-87, Negligence, Section 64. \* \* \*."**

*Vondenhuevel v. Overhead Door Corp.* (Apr. 26, 1988), 3rd Dist. No. 1-86-23, 1988 WL 40434.

**{¶13}** In the case sub judice, Price maintains that the clinic was responsible for the hazard, i.e. the doors closing while a person was in the threshold, because it had no policies and procedures for implementing the daily safety checklist provided to it by Stanley Access Technologies ("Stanley"), the company that serviced the doors at the clinic, and had no method by which it documented which employee implemented the checklist on any particular day. In addition, Price asserts that the clinic was responsible for the hazard because it determined the length of time the doors would remain open before the doors automatically closed and because it was informed by a Stanley technician that the OmniScan sensor that operated the opening and closing of the doors was obsolete and should be upgraded.

**{¶14}** We find Price's assertion regarding the clinic's control of the length of time the doors would remain open before automatically closing has merit. First,

Rich Cole, a supervisor for Stanley, testified about the operation of various sensors. For instance, Cole testified that one type of threshold sensor, referred to as the "Stan-Guard," "looks straight down from the bottom of the header across the opening of the door to make sure that there's nobody standing in the opening of the door." However, this sensor has a blind spot because of its limited width, and if there is no movement in the threshold for a certain period of time, the sensor will "time-out," resulting in the doors closing. Cole testified that the timer on the Stan-Guard is determined by the customer and can be set to time-out from anywhere between thirty seconds and three minutes. He further testified that because of the Stan-Guard's limitations, a redundant threshold sensor, referred to as a "holding beam", is often used in the sides of the doorway so the door will not close on someone who is in the threshold. Although Cole was unfamiliar with the OmniScan sensor and how it operated, his testimony reveals that there are numerous options available to customers and that it is the customer who chooses the door and the safety mechanisms that will be installed. Further, a Stanley technician recommended in June of 2003, that the OmniScan sensors be upgraded. Although this recommendation was made based upon the sensors being obsolete rather than because they were not working, the fact that the technician was making a *recommendation* to the clinic to upgrade demonstrates that the choice of sensors was the clinic's, rather than the service provider's. Thus, the clinic determined what safety devices would be utilized.

{¶15} Second, the testimony of Ralph Neddleton, the Facilities Director for the clinic, revealed that the clinic chose what company would maintain these doors and when the doors would be serviced. Further, the clinic knew in September of 2002, that another incident similar to Price's had occurred when Lee Ann Murraya, who was utilizing a walker to assist her, was knocked down by the same doors as she was entering the clinic. Once the clinic knew this type of incident could happen, it alone had the power to determine whether to have new sensors installed to accommodate the types of invitees that frequented its establishment or, if possible on the current sensors, to lengthen the amount of time before the doors would time-out or adjust the sensors that detected whether someone/something was in the pathway of the doors to ensure that the doors would not close if someone was in the threshold. Yet, even after a second similar incident in April of 2004, involving Martha Smith, the record is devoid of any evidence that the clinic took any measures to protect its invitees from this hazard.

{¶16} When construing this evidence in a light most favorable to Price, we find that a genuine issue of material fact exists as to whether the clinic created this hazard by failing to choose adequate safety measures or otherwise warning its invitees about the length of time they had to safely traverse the threshold.

{¶17} Price also maintains that the clinic had actual knowledge of the hazard and neglected to give adequate notice of its presence or to remove it

promptly. In support of her position, Price relies upon the occurrence of two similar incidents involving these doors.

{¶18} In the first incident, the affidavit of Lee Ann Murraya stated that she was injured at the clinic on September 23, 2002. More specifically, Murraya averred that she was entering the clinic through the automatic sliding doors at the main entrance with the aid of her walker when the doors started to close on her. She attempted to stop the doors but was unable to do so. The doors then knocked her to the ground. This fall resulted in a broken finger on her right hand. Murraya further stated that she was immediately taken by wheelchair to a receptionist where she checked in for her doctor's appointment. She told the receptionist about her fall and completed an incident report. Four days later, Murraya was contacted by a claims specialist from the clinic's insurance company and her claim was later settled out of court.

{¶19} In the second incident, Martha Smith was entering the clinic on April 20, 2004, aided by the use of a cane, when she was knocked down by the automatic sliding doors at the main entrance while in the threshold of the doors. As a result, Smith suffered a broken elbow. Gayle Hayman, who witnessed the incident, stated that she waited with Smith until employees of the clinic arrived and placed Smith on a stretcher and removed her from the scene.

{¶20} When viewed in a light most favorable to Price, this evidence reveals that the clinic was aware of two prior incidents where people, who were

unable to walk without assistance, were injured while in the threshold of these sets of doors. Yet, there is no evidence that the clinic took any steps to alleviate this problem. While the evidence shows that Stanley conducted routine preventive maintenance on these doors in March and June of 2003, and the doors were functioning properly and within ANSI[1] standards, there is nothing to indicate that anyone attempted to determine at any point after Murraya's fall or Smith's fall how long a person could remain in the threshold before the doors would close.

{¶21} Further, the record is devoid of any evidence that steps were taken by the clinic to ensure that disabled persons entering the clinic, who require more time to walk through a doorway than the average non-disabled person, could safely traverse through the doors. Notably, this is not a general place of business. This is a medical clinic, catering to the needs of those who may be ill, injured, and/or disabled. Although the doors may be operating properly and the time-out setting is satisfactory for the average person using those doors, the clinic was aware of at least two incidents wherein invitees who had to use assistance in order to walk were struck by these doors closing on them. At that point, reasonable minds could conclude that the clinic should have done one of two options: (1) remedied this problem by installing better sensors that could detect whether an object was in the threshold, even if that object was immobile, so that the doors would either not begin to close or not continue to close while someone/something

---

[1] ANSI is the acronym for the American National Standards Institute.

was in the path of these doors; or (2) placed some sort of notice in a location easily observed by those entering and exiting these doors, warning people to use caution and notifying them that the doors automatically close in "x" amount of time. Given this evidence, a genuine issue of material fact existed as to whether the clinic had actual knowledge of the hazard and neglected to give adequate notice of its presence or to remove it promptly.

{¶22} In addition, the clinic was made aware of the second incident on April 20, 2004, some seventeen months prior to Price's accident. However, the record reveals only one time that the doors were serviced in any kind of manner during this time frame. On that occasion in December of 2004, a service technician for Thomas Door Controls, Inc. ("Thomas Door"), the company that was under contract to service the clinic's doors at that time, came to the clinic. However, the work order shows that the technician was contacted because of a "dragging threshold," which the technician repaired by installing new guide rollers and a new operator. Nothing in this work order indicates that the technician did anything with the sensors, testing them for safety or otherwise inspecting them. Accordingly, reasonable minds could conclude that this hazard existed for a sufficient length of time, i.e. seventeen months, reasonably to justify the inference that the failure to warn against it or remove it was attributable to a want of ordinary care. Thus, there is a genuine issue of material fact as to this issue as well.

{¶23} Lastly, a genuine issue of material fact exists as to whether the clinic failed to take reasonable precautions to protect the invitee, Price, from dangers which were foreseeable from the arrangement or use of these doors. As previously noted, this obligation extends to the original installation of these doors, where it results in a dangerous condition. See *Perry*, 53 Ohio St.2d at 53, 372 N.E.2d 335. Therefore, even if these prior incidents did not occur, the clinic should have taken reasonable precautions to protect its invitees, which undoubtedly included disabled and ill persons, who often times require more time to walk through a doorway than the average non-disabled person, by equipping its doors with protection devices to prevent closure in the event that someone is in the threshold of the door.

{¶24} In light of the evidence and construing all of the evidence in a light most favorable to Price, we find that there exists a genuine issue of material fact as to whether the clinic breached its duty of care to Price, and the trial court erred in finding otherwise. Nevertheless, the clinic asserts that it did not owe Price a duty of care because the opening and closing of the doors was an open and obvious danger. We disagree, as did the trial court.

{¶25} The Supreme Court of Ohio summarized the case law on the open-and-obvious doctrine in the following manner:

> **"Where a danger is open and obvious, a landowner owes no duty of care to individuals lawfully on the premises."** *Armstrong v. Best Buy Co., Inc.*, **99 Ohio St.3d 79, 2003-Ohio-2573, 788 N.E.2d 1088, syllabus, approving and following** *Sidle v. Humphrey* **(1968), 13 Ohio St.2d 45, 42 O.O.2d 96, 233 N.E.2d 589. "[T]he**

> **owner or occupier may reasonably expect that persons entering the premises will discover those dangers and take appropriate measures to protect themselves."** *Simmers v. Bentley Constr. Co.* **(1992), 64 Ohio St.3d 642, 644, 597 N.E.2d 504. Thus, when a plaintiff is injured by an open and obvious danger, summary judgment is generally appropriate because the duty of care necessary to establish negligence does not exist as a matter of law.** *Armstrong* **¶ 14-15.**

*Lang v. Holly Hill Motel, Inc.*, 122 Ohio St.3d 120, 2009-Ohio-2495, at ¶ 11, 909 N.E.2d 120.

**{¶26}** Although a commercial building with automatic sliding doors is very common place in today's society, common experience with these doors does not suggest that they are likely to close in on a person. To the contrary, most expect that these doors are equipped with safety mechanisms to prevent the door from closing on a person to prevent injuries from occurring. For instance, these doors usually begin to close after a certain amount of time but when someone/something enters the threshold, they cease closing and either remain in their position or begin to open again. Thus, we do not find that automatic sliding doors pose the open and obvious danger of closing in on a person and causing injury such that an owner or occupier may reasonably expect that persons entering the premises will take appropriate measures to protect themselves. Accordingly, the open-and-obvious doctrine does not apply in this case.

**{¶27}** For all of these reasons, the first assignment of error is sustained.

*Second Assignment of Error*

**{¶28}** Price maintains in her second assignment of error that the trial court erred by failing to apply the doctrine of res ipsa loquitur to the premature closing of the automatic sliding doors.  In contrast, the clinic asserts that this doctrine is inapplicable because the clinic did not have exclusive control over the automatic doors and two or more equally probable causes exist for the injuries sustained by Price.

**{¶29}** "The *res ipsa loquitur* doctrine is an evidentiary rule which permits, but does not require, an inference of negligence when the elements of the doctrine are shown." *Cochran v. Ohio Auto Club* (Oct. 3, 1996), 3rd Dist. No. 9-96-33, 1996 WL 562055, citing *Morgan v. Children's Hospital* (1985), 18 Ohio St.3d 185, 480 N.E.2d 464.  Whether the doctrine of res ipsa loquitur applies is determined on a case-by-case basis. *Jennings Buick, Inc. v. Cincinnati* (1980), 63 Ohio St.2d 167, 171, 406 N.E.2d 1385.

> **To warrant the application of the rule plaintiff must adduce evidence in support of two conclusions (1) That the instrumentality causing the injury was, at the time of the injury, or at the time of the creation of the condition causing the injury, under the exclusive management and control of the defendant; and (2) that the injury occurred under such circumstances that in the ordinary course of events it would not have occurred if ordinary care had been observed.**

*Id*. at 170, citing *Hake v. George Wiedemann Brewing Co.* (1970), 23 Ohio St.2d 65, 66-67, 262 N.E.2d 703; *Fink v. New York Cent. R. Co.* (1944), 144 Ohio St. 1,

56 N.E.2d 456. "*Res ipsa loquitur* does not apply where the facts are such that an inference that the accident was due to a cause other than defendant's negligence could be drawn as reasonably as if it was due to his negligence." *Cochran*, supra, citing *Greer v. Frazier-Williams Chevrolet-Oldsmobile, Inc.* (Apr. 3, 1991), 1st Dist. No. C-900242.

{¶30} Here, the clinic asserts that it did not have exclusive management and control of the door because it contracted with Stanley and later Thomas Door for the maintenance and inspection of the doors. The clinic also maintains that there are other efficient and probable causes of Price's injury that are not attributable to the negligence of the clinic.

{¶31} As to the issue of exclusive management and control, Cole testified that the customer, such as the clinic, signs a contract for preventative maintenance with the company and the contract terms provide how often maintenance will be performed. Further, the customer determines when maintenance will be performed. For instance, Cole testified that some customers request that the Stanley technician call before coming to the customer's location. Otherwise, the technician will simply go to the location and inquire of the customer whether "it's a good day for the inspection." (Cole Depo., p. 16-17.) Beyond preventative maintenance, the service provided by Stanley is at the request of the customer because "we [Stanley] don't go somewhere we're not asked to go." (id. at p. 18.)

{¶32} Neddleton testified that the service contract with Stanley, and later Thomas Door, was for a yearly inspection of the doors and for any repairs/maintenance needed on the doors. If a repair was needed, the technician would provide a service ticket to Neddleton, who would either approve or disapprove of the repair. Then any approved repairs would be performed by the technician. Beyond this, the clinic's maintenance department is not responsible for the maintenance of the doors but is responsible for making sure that the doors operate safely at the beginning of each business day. In order to do this, a maintenance worker unlocks the doors[2] and turns them on at approximately 6:30 each morning. The worker then follows a checklist, which is located on the upper right-hand corner of the outside door frame. This procedure consists of allowing the doors to "cycle" close, and then the worker walks through both sets of doors (beginning on the inside of the clinic, as the worker enters the clinic through an employee entrance) and back through them. This walk-through is done one time. However, this does not include stopping in the threshold to determine whether the doors will close on the worker.

{¶33} A review of the evidence also reveals that Stanley conducted preventative maintenance in March and June of 2003, and at that time the threshold scan and/or safety beams were working properly and within ANSI

---

[2] Neddleton testified that security for the clinic locks the doors each night between 10:00 p.m. and 10:30 p.m.

standards. The only other documentation regarding the servicing of these doors was in December of 2004. At that time, the work order shows that a Thomas Door technician was contacted because of a "dragging threshold." This document states in a section entitled "Service Performed" that the technician, "REMOVED DOORS. INSTALLED NEW BOTTOM GUIDE ROLLERS AND INSTALLED NEW OPERATOR. SET & ADJUST. AS NEEDED. WORKING GREAT AT THIS TIME." However, nothing in this work order indicates that the technician did anything else with the door, including with the sensors, such as testing them for safety or otherwise inspecting them, or that the technician was making any representations as to whether the sensors on the door were within ANSI standards.

{¶34} Price was injured in September of 2005, some nine months after this last service. During this time, the evidence reveals that the only people responsible for ensuring that the doors worked properly and safely were the employees in the clinic's maintenance department. While anyone entering and exiting the clinic was capable of activating the doors by merely entering the pathway of the sensors responsible for automatically opening the doors, the record is devoid of any evidence that the general public could manipulate the activity and/or sensitivity of the sensors either purposely or inadvertently or, more importantly, could make decisions about the timing of the sensors or the *closing* of

the doors.[3]

{¶35} Further, the clinic exerted exclusive management and control over when these doors were accessible to the public by locking them at night and unlocking them in the morning. Neddleton also provided testimony as to what would happen if the doors did not function properly, such as shutting them down in the event that they malfunctioned or securing them in an open position if there was an operational problem. (Neddleton Depo., pp. 27, 30.) Thus, the evidence when viewed in a light most favorable to Price indicates that the clinic had the sole power to determine when and if the public would have access to these doors.

{¶36} Moreover, the clinic determined what kind of doors it would have, what sensors it wanted on these doors,[4] what company would maintain these doors, and when the doors would be serviced. Further, once the clinic knew of two other incidents similar to Price's, it alone had the power to determine whether to have new sensors installed to accommodate the types of invitees that frequented its establishment or, if possible on the current sensors, to lengthen the amount of time before the doors would time-out or adjust the sensors that detected

---

[3] We find the cases cited by the clinic regarding public access to instrumentalities causing an invitee injury to be inapposite to the case sub judice. Rather, those cases involved situations wherein the public's access to these things could have as readily resulted in the injuries to the plaintiff as any act or omission by the defendant-business. See e.g., *Hansen v. Wal-Mart Stores*, 4th Dist. No. 07CA2990, 2008-Ohio-2477 (merchandise display was in location that customers could access and manipulate).

[4] The June, 2003, work order of Stanley indicated that the Stanley technician *recommended* the OmniScan sensors be upgraded. As noted, this recommendation was made based upon the sensors being obsolete, rather than because they were not working. The fact that the technician was making a recommendation to the clinic to upgrade obviates the fact that the choice of sensors was the clinic's, rather than the service provider's.

whether someone/something was in the pathway of the doors.

{¶37} For all of these reasons, we find that Price presented sufficient evidence that *at the time of her injury*, the doors were under the exclusive management and control of the clinic.

{¶38} Our inquiry does not end there, however. The next question is whether the injury occurred under such circumstances that in the ordinary course of events it would not have occurred if ordinary care had been observed. Several courts have concluded that "[a]utomatic doors do not, in the ordinary course of things, cause injury to those who pass through them." *Brown v. Scrivner, Inc.* (1992), 241 Neb. 286, 488 N.W.2d 17, 19, see, also, *Rose v. Port of New York Auth.* (1972), 61 N.J. 129, 293 A.2d 371, 375 (holding that "[m]embers of the public passing through automatic doors, whether in an airport, office building or supermarket do so generally, without sustaining injury. What happened to the plaintiff here is fortunately unusual and not commonplace. It strongly suggests a malfunction which in turn suggests neglect.") (noted in Prosser and Keeton on the Law of Torts (W. Keeton 5th ed. 1984)); *Landmark Hotel & Casino, Inc. v. Moore* (1988), 104 Nev. 297, 757 P.2d 361, 364 (finding that "[a]utomatic sliding glass doors * * * are ubiquitous, affording the public safe ingress and egress to countless facilities on a daily basis. What happened to Moore is unusual; it strongly suggests a malfunction attributable to negligence."). But see, *Hisey v. Cashway Supermarkets, Inc.* (1967), 77 N.M. 638, 426 P.2d 784.

{¶39} We agree with those courts that have found that automatic doors do not ordinarily close on a person absent negligence. Nevertheless, the clinic maintains that there is more than one reasonable probable cause of the doors closing on Price, which is not attributable to the clinic's negligence: (1) the manufacturer's limit to a maximum of three minutes for the doors to remain open when Price may have needed more time to traverse the doors; (2) poor design of the sensor that may not have "seen" Price while she was standing in that area of the door; and (3) Price's failure to position herself where the sensors could detect her or "to move quickly enough to have avoided the closing door."

{¶40} What the clinic fails to acknowledge is that none of these contentions alleviates its knowledge of the door's sensors and thus, its negligence in failing to address these issues. The clinic knew the make-up of its clientele. The clinic would be the party with the knowledge about what doors it used and what type of timing the sensors had. The clinic knew of two other incidents wherein disabled invitees were injured when they did not "move quickly enough" to avoid being struck by the closing automatic doors. Yet, the record is devoid of any evidence that the clinic did anything to obtain more sensitive sensors, lengthen the amount of time before the doors timed-out, if possible, or otherwise warn its disabled invitees to stay in the path of the sensors and/or "move quickly enough to avoid injury." Further, there is nothing in the record to show that Price acted in any negligent manner. Her undisputed testimony demonstrates that she merely

attempted to walk through the doorway as one would ordinarily do, albeit slowly due to the fact that she needed a walker to walk, having had six hip replacements in her lifetime. Simply not having the agility to avoid being hit by a closing door does not amount to negligence. Therefore, we find that Price was injured under such circumstances that in the ordinary course of events would not have occurred if *ordinary care* had been observed. Accordingly, the doctrine of res ipsa loquitur does apply, and the first assignment of error is sustained.

**{¶41}** For all of these reasons, the judgment of the Common Pleas Court of Marion County, Ohio, is reversed and the cause remanded for further proceedings consistent with this opinion.

*Judgment Reversed and Cause Remanded*

**WILLAMOWSKI, P.J., and ROGERS, J., concur.**

**/jnc**